SHEARMAN CONCRETE PIPE COMPANY *v.* WOOLDRIDGE.

4-9261                                           234 S. W. 2d 382

Opinion delivered November 6, 1950.

Rehearing denied December 18, 1950.

*Hardin, Barton & Shaw, Robert L. Jones, Jr., Franklin Wilder* and *Lawrence S. Morgan,* for appellant.

*Jeptha A. Evans* and *Charles I. Evans,* for appellee.

ED. F. McFADDIN, Justice. This case results from a three-vehicle traffic mishap which occurred on U. S. Highway 71, about one mile west of the town of Jenny Lind in Sebastian County. Appellees were plaintiffs and appellants were defendants in the trial court; and this appeal challenges the correctness of the judgments based on the jury verdicts for the plaintiffs. For convenience, we will refer to the parties as they were styled in the lower court.

On June 11, 1949, the Wooldridge family—consisting of Earl Wooldridge, his wife, their two daughters, and his mother-in-law—were in a three-quarter ton truck, traveling west on U. S. Highway 71. The truck was being driven by Merlene Wooldridge,[1] a daughter; and Mrs.

[1] She was eighteen years of age and had a driver's license.

18

Wooldridge and her mother, Mrs. Bell, were in the seat with the driver. Earl Wooldridge and the other daughter were in the back of the truck, using a tarpaulin to protect them because there had been a rain. As the Wooldridge truck was proceeding west—and therefore traveling on the north half of the concrete slab—and approximately 325 feet east of the Adams Filling Station, a red truck (alleged to be that owned and driven by defendant Paul Bridges) entered U. S. Highway 71 from a south side road, and turned east, thereby facing the Wooldridge truck. This red truck, instead of turning directly on the south side of the highway, made a wide swing in turning, and went on the north half of the concrete slab in front of the approaching Wooldridge truck. The driver of the Wooldridge truck, in order to avoid a possible collision with the red truck, turned off the concrete slab to the gravel shoulder on the north; and then began the chain of events that led up to the resulting collision between the Wooldridge truck and the truck of the Shearman Concrete Pipe Company (hereinafter called "Shearman"), and being driven by its driver, Joseph Daniels.[2] Merlene Wooldridge testified that when she saw the red truck in her traffic lane on the highway, she was driving 35 to 40 miles per hour but reduced the speed to approximately 25 miles per hour.

Witnesses for the Wooldridges testified that the concrete slab (18 feet wide) was a few inches higher than the gravel shoulder, and that when the Wooldridge truck started back on the concrete slab, the truck skidded and went off the slab on the south shoulder, then skidded, and went off the slab on the north shoulder, and then careened back on the slab and south across the center line where the collision occurred between the Wooldridge truck and the Shearman truck. The Shearman truck (headed east) never crossed the center line of the highway, was always on its own right-hand side, and its right wheels went off the slab and to the south shoulder in a futile effort to avoid the collision. The *right* front fender of the Wooldridge truck came in contact with the left front of the

---

[2] That Daniels was then the servant of Shearman and acting in the scope of his employment is a conceded fact.

Shearman truck. As a result of the collision, all of the Wooldridges were injured; and Mrs. Wooldridge's mother—Mrs. Bell—was killed.

Actions[3] were filed by proper plaintiffs against Paul Bridges (alleged to have been the driver of the red truck that entered the highway from the side road) and against Shearman and its driver, Daniels. The theory of the plaintiffs was that the negligence of Bridges had concurred with that of Shearman and Daniels to cause the stated result, and that each of the parties in the Wooldridge truck had been free of negligence. From verdicts and judgments for the plaintiffs, defendants bring this appeal, presenting the points now to be discussed.

I. *Evidence of Negligence of Shearman and Its Driver, Daniels.* There was no testimony that Daniels[4] was driving too fast, or that he was on the wrong side of the highway, or that he was violating any of the other so-called "rules of the road." Plaintiffs' only claim of negligence against Shearman was that Daniels could and should have discovered the perilous situation of the Wooldridge truck in time to have avoided the collision, and could have avoided it with the exercise of ordinary care, and that he failed to use such care. This claim of the plaintiff was submitted to the jury in Plaintiffs' Instruction No. 3 which is too lengthy to copy in full, but in it the Court instructed the jury that Shearman would be liable:

". . . and if you further find that the said Joseph Daniels saw said Wooldridge truck slipping, sliding and skidding back and forth across and along said highway, . . . in a perilous position;

". . . and if you further find that the said Joseph Daniels appreciated the said perilous position, if any, of the occupants of the Wooldridge truck, at a time when his

---

[3] Two actions were filed, one by the administratrix of Mrs. Bell's estate, and the other by the four Wooldridges. The actions were consolidated for trial.

[4] As previously stated, Daniels was Shearman's driver and any negligence of Daniels would be chargeable against Shearman. So in speaking of the acts of Daniels, it necessarily means the acts for which Shearman was responsible.

truck was at a sufficient distance away from and west of the Wooldridge truck that by the exercise of ordinary care he could have avoided the collision;

". . . and if you further find that the said Joseph Daniels had the means at his command and within his control to avoid the collision;

". . . and if you find that by the exercise of ordinary care the defendant Joseph Daniels could have avoided the collision;

". . . and if you further find that the said Joseph Daniels failed to exercise ordinary care to avoid said collision; . . ."

Plaintiffs' Instruction No. 3 is the only one on which was predicated a claim for recovery against Shearman and Daniels; and the giving of this instruction is urged as fatal error. The basis of such claim is that there was no evidence to show that Daniels was guilty of any negligence. This necessitates a review of all of the evidence as to when Daniels discovered the perilous condition of the Wooldridge truck and what Daniels did, or failed to do thereafter; and in so reviewing the evidence, we necessarily take that version most favorable to the plaintiffs. (See *Potashnick Local Truck System* v. *Archer*, 207 Ark. 220, 179 S. W. 2d 696, and cases there cited; and see other cases collected in West's Arkansas Digest, "Appeal and Error," Key Number 930.)

The collision between the Wooldridge truck and the Shearman truck occurred in front of the Adams Filling Station. Merlene Wooldridge testified that the Shearman truck was "almost in front of" the Adams Filling Station when she first saw it. Mrs. Wooldridge (also in the driver's seat with Merlene) testified that she did not see the Shearman truck until just before the collision. Joseph Daniels, the driver of the Shearman truck, when called by the plaintiffs as their witness, testified that he was traveling 25 or 30 miles per hour before he applied his brakes; that after applying the brakes he could stop within 40 or 50 feet; and that he stopped as quickly as he could. No other witnesses called by the plaintiffs

claimed to have seen the collision; but through pictures of the highway, measurements of distances, and the testimony of witnesses in rebuttal, the plaintiffs claimed that Daniels *could, and should,* have seen the Wooldridge truck in its difficulties while Daniels was 825 feet west of, and away from, the Wooldridge truck; that Daniels at such distance should have appreciated the peril in which the occupants of the Wooldridge car had been cast (*i e.,* in a car out of control and swerving north and south across the highway); and that Daniels should have stopped his truck several hundred feet west of the Adams Filling Station, and thereby avoided the collision.

Of course the claim of the plaintiffs is based on their attempt to apply to this case some of the phases of the so-called "discovered peril doctrine" or "the last clear chance doctrine," which doctrine, most succinctly stated, is that the contributory negligence of the plaintiff does not preclude a recovery for the negligence of the defendant when it appears that the defendant, by exercising reasonable care and prudence *after discovering* the perilous condition of the plaintiff, could have avoided the injurious consequences to the plaintiff. See *Sylvester* v. *U-Drive-Em System,* 192 Ark. 75, 90 S. W. 2d 232, and *Boone* v. *Massey,* 212 Ark. 280, 205 S. W. 2d 454. See, also, 38 Am. Jur.[5] 900.

Now, in the case at bar, the plaintiffs do not admit that they were cast in the position of peril through their own negligence. Rather, they insist that they were placed in the position of peril through the negligence of Bridges. So all of the phases of the doctrine of discovered peril are not present in this case. But in their said Instruction No. 3 (as previously quoted) the plaintiffs sought recovery from Shearman and Daniels on the theory that Daniels failed to exercise ordinary care *after he discovered* the perilous condition of the Wooldridge truck. Therefore the vital questions are: (1) when did Daniels actually discover the perilous condition of the Wooldridge truck; and

[5] In 1 Ark. Law Review 13 there is a discussion of Arkansas cases on "last clear chance." Likewise, in 4 Ark. Law Review 102 there is a case note on "last clear chance."

(2) did he have sufficient time thereafter to have avoided the collision with the exercise of due care.

To determine these questions, we must turn to Daniels' testimony, since, as previously stated, he is the only eye-witness who testified as to the collision, with the exception of Merlene Wooldridge and her mother (whose testimony we have previously mentioned), and with the exception of Paul Bridges whose testimony is entirely unfavorable to the Wooldridges.

Daniels[6] testified that he was all the time on the south half of the highway; that he was driving about 25 or 30 miles an hour when he first saw the Wooldridge truck; that it was then 250[7] feet away from him and on the north side of the highway with its right wheels on the gravel shoulder[8]; that he thought the Wooldridge truck was going to turn into the Adams Filling Station (located on the north side of the highway), but then he realized that the Wooldridge truck was trying to get on the concrete slab and continue west; that immediately after such realization, and instantly before the collision, the Wooldridge truck got on the concrete slab and darted across the center line towards his truck; that he then put on his brakes, pulled his truck to the south shoulder, and headed towards the ditch in an effort to avoid the collision; and that his truck did come to a stop in the ditch.

[6] In turning to the testimony of Daniels, we are not holding that a case on appeal from a plaintiff's verdict is ever to be tested by the defendant's version of the transaction if in conflict with the plaintiff's. Rather, we are giving Daniels' testimony as the only testimony in the record on the point and thus using it in an effort to support the plaintiffs' version, as best it will.

[7] At the trial in this case Daniels testified that he saw the Wooldridge truck 250 feet away from him. While there was testimony in plaintiffs' direct and rebuttal evidence to the effect that Daniels at other times had stated that he saw the Wooldridge truck at a greater distance than 250 feet and "weaving" and apparently out of control, nevertheless no witness testified contrary to Daniels' statement that until the Wooldridge truck started to dart across the slab to the south (for the last time) Daniels thought the Wooldridge truck was preparing to turn into the Adams Filling Station there on the north side of the highway. Likewise, the pictures, diagrams and maps do not serve to dispute Daniels' statement that he thought the Wooldridge truck was about to turn into the Adams Filling Station.

[8] Evidently the Wooldridge truck had gone from the south shoulder to the north shoulder, and was then on the north shoulder for the last time before the collision.

Thus, the evidence shows that when Daniels realized that the Wooldridge truck was not going into the Adams Filling Station, it was immediately before the Wooldridge truck darted across the slab and struck the Shearman truck. The testimony of Merlene Wooldridge was that she had slowed her truck to 25 miles an hour, so it was traveling about 36 feet per second. The concrete slab was 18 feet wide. Thus the Wooldridge truck could cross the concrete slab from north to south in half a second. When called by the plaintiffs, Daniels testified that he could stop his truck in a distance of 40 to 50 feet after he knew he had to stop. He was also traveling at 25 miles per hour, which is 36 feet per second; so it required him more than a second to stop after he knew he had to stop, and yet the Wooldridge truck hit his truck within half a second after it started across the highway; and it was not until it started across the highway that he discovered its perilous condition.

The recital of these facts demonstrates that the plaintiffs failed to show that Daniels was guilty of any negligence either before or after he discovered the perilous condition of the Wooldridge truck.[9] Therefore, the

---

[9] Even though the entire doctrine of "discovered peril" or "last clear chance" is inapplicable to this case, as heretofore stated, nevertheless it is interesting to note that even in cases applying the entire doctrine, the Courts have held that there must be some interval of time between the discovery of the perilous condition of the plaintiff and the failure of the defendant to avoid the peril. For instance, in *St. Louis Southwestern Railway Co.* v. *Simpson*, 286 U. S. 346, 76 L. Ed. 1152, 52 Sup. Ct. 520, Mr. Justice CARDOZO, in discussing the necessity of a substantial interval of time, used this language:

". . . The negligence of the conductor in failing to give warning was not separated by any considerable interval from the consequences to be averted, nor is there any satisfactory proof that warning, if given, would have been effective to avert them. The transaction from start to finish must have been a matter of seconds only. In the brief for the respondent nice calculations are submitted in an attempt to prove that if the conductor had applied the brakes at once, his train could have been stopped at a point that would have separated it by a space of approximately half a mile from train No. 18 rushing on from the south, and that if all this had happened, the engineer of No. 18 might have noticed the stationary train in time to stop his own and thus prevent collision. Calculations so nice are unavailing to prove anything except the unity of the whole transaction. The several acts of negligence were too closely welded together in time as well as in quality to be viewed as independent. . . ."

The facts in the case at bar clearly distinguish it from the holding of the Circuit Court of Appeals of the Fourth Circuit in *Swift* v. *Young*, 107 Fed. 2d 170, because in that case the truck driver admitted that he

trial court erred in giving plaintiffs' Instruction No. 3—since there was no evidence on which to base such instruction. Instead, the trial court should have given Instructions 3 and 4 (peremptory instructions) requested by Shearman and Daniels, since no negligence was shown against them. The case as to Shearman and Daniels is therefore reversed and dismissed.

II. *Evidence of Negligence of Bridges.* The plaintiffs' cases as to Bridges were based largely on the testimony of Merlene Wooldridge to the effect that Bridges' truck, in entering Highway 71, made a wide swinging turn, and thereby forced her to drive off the concrete slab and caused the skidding and sliding that resulted in the collision with the Shearman truck. Bridges denied that his truck had so entered the highway, and sought, by testimony of witnesses and by physical facts, to prove that his truck was not the one that Merlene Wooldridge saw. He claims that he was entitled to an instructed verdict because such physical facts disproved the testimony of Merlene Wooldridge.[10] But the fact remains that Merlene Wooldridge positively identified Bridges' truck, and that the so-called "physical facts" at most made a case for the jury as to whether Merlene Wooldridge was correct in identifying Bridges' truck. Therefore, there was sufficient evidence to take the case to the jury as to Bridges' negligence; and he was not entitled to the instructed verdict which he requested.

III. *Damages Against Bridges.* As to the injuries received by Earl Wooldridge and his wife and two daughters, there was offered the testimony of the parties, the testimony of Dr. Eberle, and also the written report of Dr. Krock, who was not called as a witness. It is in regard to this written report of Dr. Krock that an error occurred which necessitates a reversal and a remanding as to the appellant, Bridges.

saw the perilous condition of the approaching and skidding vehicle but decided he could "get through" and thus drive on. There the truck driver took a chance and failed; and so was held liable. The truck driver in the case at bar took no such chance.

[10] For some of our cases in which "physical facts" were invoked, see: *Alldread* v. *Mills*, 211 Ark. 99, 199 S. W. 2d 571, and *Newsom* v. *Glaze*, 215 Ark. 40, 219 S. W. 2d 232, and cases there listed.

Prior to the trial, the plaintiffs' attorneys had an agreement with the attorneys for Shearman and Daniels that such written report, signed by Dr. Krock, might be admitted in evidence without requiring him to be present. However, no such agreement was made by the attorneys for Bridges; and of course the written report—upon Bridges' objection—was inadmissible as to him, since it was "hearsay."[11]

At the trial, plaintiffs introduced the report of Dr. Krock; and the attorneys for Shearman and Daniels promptly honored their agreement. Bridges' attorney objected to the report, just as he had a right to do. The trial court admitted the report in evidence, and this occurred:

"The Court: . . . the jury is instructed not to consider this report against the defendant Bridges, but only against the Shearman Concrete Pipe Company and Joseph Daniels.

. . . . . . .

"Mr. Wilder: Save our exceptions to the action of the court in admitting this report in evidence and to the action of the court in overruling our motion for a mistrial."

Thus the jury had much stronger evidence of injuries on which to base the verdicts against Shearman than it had on which to base the verdicts against Bridges. When the jury attempted to return its first verdict in the Wooldridge case, this was the form:

"We, the jury, find for all the plaintiffs the sum of Twenty Five Thousand Dollars ($25,000), Five Thousand Dollars ($5,000) assessed against Paul Bridges and Twenty Thousand Dollars ($20,000) against Joseph Daniels and Shearman Concrete Pipe Company."

The Court refused to accept the verdict and told the jury:

---

[11] See *Roberson* v. *Roberson*, 188 Ark. 1018, 69 S. W. 2d 275; *Southern Insurance Company* v. *Floyd*, 174 Ark. 372, 295 S. W. 715; *National Life & Accident Ins. Co.* v. *Threlkeld,* 189 Ark. 165, 70 S. W. 2d 851, and *Southern National Insurance Co.* v. *Heggie*, 206 Ark. 196, 174 S. W. 2d 931.

"You cannot bring in a verdict of this sort. You must separate the amounts and show how much is for each one of the plaintiffs. I am going to send you back and I will give you a new verdict sheet to write your verdict on. It isn't your duty to divide the amounts between the different defendants. If you find against both, you say, 'We, the jury, find for the plaintiff' and state the amount, but you are not to say that any defendant is to pay so much. That is to say you can't divide the amounts among the defendants."

Bridges' attorney duly and seasonably objected and preserved his objections; and fifteen minutes after the first verdict was refused, the jury returned with the following verdict which was accepted by the Court and entered as the judgment over the objections and exception of Bridges, to-wit:

". . . We, the jury, find for the plaintiff Earl Wooldridge in the sum of twenty thousand dollars, and for the plaintiff Susie Wanda Wooldridge in the amount of two thousand dollars, for the plaintiff Merlene Wooldridge in the amount of one thousand dollars, and for the plaintiff Vera Jean Wooldridge in the amount of two thousand dollars."

Now it is instantly apparent that by the Court's action in refusing to allow the jury to return the first verdict, and in requiring that damages for the same amount be returned against Bridges as against Shearman, that the Court impliedly allowed the Krock report to be considered against Bridges. This was of course a violation of Bridges' right to be confronted by the witness whose report was thus received.

We need not decide whether the trial court was correct in allowing the written report in evidence, even with the admonition given, or whether, under the circumstances, the Court should have received the jury's first effort to return a verdict, because, at all events, the result of the entire proceedings was prejudicial to Bridges: such is clearly shown by the fact that the sum, $25,000, which was mentioned in the first verdict, was likewise used in the. second verdict, and whereas only $5,000 had

been assessed against Bridges in the first verdict, the entire $25,000 was assessed against him in the second verdict. We cannot affirm as to the $5,000 in the first verdict, because it was never accepted by the Court as a verdict.[12] So the case of Mr. and Mrs. Wooldridge and the two daughters against Bridges must be reversed and remanded.

As to the judgment for the death of Mrs. Bell, that case is in all things affirmed insofar as Bridges is concerned.

Neither the Chief Justice nor Mr. Justice HOLT participated in this case.

---

[12] See *Clift* v. *Jordan*, 207 Ark. 66, 178 S. W. 2d 1009. Since a verdict is the "final decision" of a jury (53 Am. Jur. 695), it necessarily follows that any effort of a jury to report—short of a "final decision"—cannot really be called a verdict, although the expressions "first verdict" and "second verdict" are used to differentiate the efforts of the jury to reach a final decision.