James Dean WALKER, Appellant,

v.

A.L. LOCKHART, Superintendent of the Arkansas Department of Corrections, Appellee.

No. 81–1700 (habeas).

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 29, 1983.

Decided Jan. 18, 1984.

Certiorari Denied April 30, 1984. 104 S.Ct. 2168.

Mandate Recalled June 13, 1984.

See also 713 F.2d 1378.

claim of bias of the state trial judge. We affirm the orders of the district court denying the writ of habeas corpus.

On the night of April 15, 1963, defendant Walker and a companion, Russell Freeman Kumpe, were in the company of Mary Louise Roberts and Linda Ford at the South Main Business Men's Club.. Following an altercation in which another patron was accidentally shot, Walker and Kumpe fled the scene as did the two women. Ford accompanied the two men in their Oldsmobile, while Roberts followed in a cab. Alderman, the cab driver, upon inquiry of Roberts, verified that the men were involved in the shooting at the club. He notified his dispatcher who instructed him to follow the Oldsmobile until the police arrived. Alderman, however, was unable to keep pace with the Oldsmobile as it proceeded into North Little Rock, Arkansas, but another cab driven by Thomas Short took up the pursuit with the Alderman cab continuing to follow.

North Little Rock, Arkansas Police Officers Barentine and Vaughan[2] were ordered to give pursuit, which they did in separate cars. Officer Barentine overtook and stopped the Oldsmobile, and parked his car behind it. Officer Vaughan arrived immediately thereafter and parked his car more in the center of the road. The cabs driven by Short and Alderman arrived, parking on the opposite side of the highway. Officer Barentine stepped to the front of his police car and ordered Kumpe to get out of the car and come back to his police car, and then proceeded to search him. Officer Vaughan approached the Oldsmobile on the passenger side of the car. There was an exchange of gunfire, as a result of which Walker was shot five times and Officer Vaughan was shot one time. Linda Ford was seated in the middle of the front seat next to Walker, who was sitting by the right door. Ford later testified that Walker fired the first shot. She heard the gun-

Bill Bristow, Jonesboro, Ark., for appellant.

Theodore Holder, Little Rock, Ark., for appellee.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG and BOWMAN, Circuit Judges, en banc.

JOHN R. GIBSON, Circuit Judge.

James Dean Walker, convicted of murder arising out of an incident in 1963, again files a petition for habeas corpus. The district court[1] denied the writ, hearing evidence on only a portion of Walker's claims and refusing to hear additional evidence on claims earlier asserted. Walker contends that, under the guidelines established in *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), for successive habeas petitions, the district court erred in denying reconsideration of his

1. The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

2. We note that the names of Officers Barentine and Vaughan have multiple spellings in prior opinions. The spellings that we adopt here are those that appear in the record of Walker's second trial.

shot and could see the Vaughan gun when it fired.

Officer Vaughan was found lying near the front door of the Oldsmobile, and died within a short time before he could make a statement. Walker was also found lying outside the Oldsmobile, holding a fully loaded snub-nosed pistol in his hand. Underneath him or right beside him was a second gun, a .38 caliber Smith & Wesson, which was later identified by ballistics experts as being the gun from which the bullet was fired that caused Officer Vaughan's death.

In the first trial, Walker was convicted of first degree murder and was sentenced to death. This conviction was reversed by the Supreme Court of Arkansas, and the case remanded for new trial. *Walker v. State*, 239 Ark. 172, 388 S.W.2d 13 (1965). Upon retrial,[3] Walker was again convicted of first degree murder but was sentenced to life imprisonment. This conviction was affirmed by the Supreme Court of Arkansas. *Walker v. State*, 241 Ark. 300, 408 S.W.2d 905 (1966), *cert. denied*, 386 U.S. 682, 87 S.Ct. 1325, 18 L.Ed.2d 403 *reh'g denied*, 387 U.S. 926, 87 S.Ct. 2027, 18 L.Ed.2d 987 (1967).

Walker filed a petition for habeas corpus, and a three-day hearing before the United States District Court resulted in dismissal of his petition. *Walker v. Bishop*, 295 F.Supp. 767 (E.D.Ark.1967).[4] He then appealed to this court, and a unanimous panel

affirmed the judgment of the district court. *Walker v. Bishop*, 408 F.2d 1378 (8th Cir. 1969).

Walker escaped from the penitentiary in Arkansas in 1975. Litigation concerning his extradition was finally determined by the United States Supreme Court.[5]

Walker then filed a second petition for writ of habeas corpus together with a civil rights claim based on 42 U.S.C. § 1983.[6] On June 2, 1981, the district court entered a written order finding that four of the grounds in plaintiff's petition were identical to those asserted in the earlier petition for writ of habeas corpus determined in 1967, and should not be relitigated. *Walker v. Lockhart*, 514 F.Supp. 1347, 1352 (E.D.Ark.1981). These were: (1) that the presiding judge in the murder trial was biased against plaintiff, (2) that there was official misconduct in the state court trial by the North Little Rock Police Department in allegedly withholding exculpatory evidence and witnesses from plaintiff, (3) that prejudicial pretrial publicity made a fair trial impossible, and (4) that the sum total of the claimed defects in the state trial were so serious as to violate his constitutional right to a fair trial. The court ruled that other issues not earlier presented should be further considered. It conducted a hearing on these new issues and denied Walker's petition.

In the order denying Walker the right to relitigate those grounds previously deter-

---

**3.** References to the record of Walker's second trial will be designated throughout this opinion as R. II, ——; references to Walker's first habeas corpus proceeding will be designated as H. I, ——; references to Walker's second habeas corpus proceeding will be designated as H. II, ——.

**4.** The Honorable J. Smith Henley, then Chief Judge of the United States District Court for the Eastern District of Arkansas, and later a member of this court, conducted this hearing.

**5.** Following his escape, Walker remained at large until he was apprehended in California in 1979. In February 1980, the Governor of California honored a request that was made by the Governor of Arkansas for Walker's arrest and rendition. Walker challenged the Governor's issuance of the warrant in both state and federal courts. He was unsuccessful until he reached the Supreme Court of California, which, on April 9, 1980, issued a writ of habeas corpus directing the superior court to conduct hearings to determine if the penitentiary in which Arkan-

sas sought to confine Walker was operating in conformance with the eighth amendment to the United States Constitution.

Granting certiorari, the United States Supreme Court reversed and remanded. *Pacileo v. Walker*, 449 U.S. 86, 101 S.Ct. 308, 66 L.Ed.2d 304 (1980). In a per curiam decision, the Supreme Court held that once the Governor of California had issued the warrant for arrest and rendition in response to the request of the Governor of Arkansas, claims as to constitutional defects in the Arkansas penal system should be heard in the courts of Arkansas, not those of California. *Id.* at 88, 101 S.Ct. at 309.

**6.** Walker's civil rights claim is severable in nature from his habeas claim and is the subject of separate disposition by the original panel. For administrative purposes, the court has designated Walker's appeal from the denial of habeas relief as No. 81–1700 (habeas) and his appeal from the dismissal of his section 1983 claim as No. 81–1700 (civil rights).

mined, the district court carefully considered the guidelines for successive applications set down in *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). The court found that the same grounds presented in the application before it were previously determined adversely to petitioner on the prior application. The prior determination was on the merits, and there was no new evidence and no intervening change in the law which would "serve the ends of justice by reconsidering the merits of the plaintiff's subsequent habeas application." *Walker v. Lockhart*, 514 F.Supp. at 1350–51.

This appeal then followed, with arguments heard before a panel of this court. By order dated June 2, 1982, the case was referred to the court en banc for rehearing, and the parties were requested to rebrief the following issues:

1) What factors disclosed by the records in this case indicate that this court should or should not consider a successive petition for habeas corpus by appellant Walker.

2) Have the constitutional violations alleged (including prejudice of the trial judge and suppression of evidence by police and prosecutors, or either of them, or other violations) grossly flawed or not flawed the guilt determination in this case.

3) If necessary, should this court remand the habeas corpus action to the district court for a determination on the merits, or can this court properly rule on the merits of the habeas corpus petition in the present appeal.

After argument, the first submission was vacated, and the case was heard for a second time by the court en banc.

Walker now argues, as he did before the district court, that there has been a change in the law, primarily from the Fifth Circuit's decision in *United States v. Brown*, 539 F.2d 467 (5th Cir.1976) (per curiam). He contends that the district court should have considered the claim of bias of the trial judge arising from the tone of voice and courtroom demeanor, which essentially

is a factual issue recognized in *Brown*. He further argues that the appearance of justice consideration articulated in *Brown* brought about an objective, as opposed to a subjective, review of claims of trial court bias. He argues this is sufficient to authorize reconsidering the merits of his claim of bias. Walker also argues that the ends of justice would be served by reexamining the bias issue because he is innocent. He points to the weakness of the evidence giving rise to his conviction. He stresses various claims of suppressed evidence and conflicting evidence which admittedly were discussed in the decision of the Arkansas Supreme Court and the two decisions relating to the prior petition for habeas corpus.

I. The Trial Court's Asserted Bias

A. Criteria for Considering Successive Habeas Petitions

 Res judicata does not apply to petitions for writ of habeas corpus. *See Allen v. McCurry*, 449 U.S. 90, 98 n. 12, 101 S.Ct. 411, 416 n. 12, 66 L.Ed.2d 308 (1980). The question of what consideration a federal court should give to a successive habeas petition was discussed by the United States Supreme Court in *Sanders v. United States*, 373 U.S. 1, 15–19, 83 S.Ct. 1068, 1077–79, 10 L.Ed.2d 148 (1963).[7] In *Sanders* the Supreme Court established several guidelines for regulating successive applications on grounds previously heard and determined. These guidelines were summarized by the Court as follows:

Controlling weight may be given to denial of a prior application for federal habeas corpus or § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.

*Sanders v. United States*, 373 U.S. at 15, 83 S.Ct. at 1077 (footnote omitted).

 Following the *Sanders* decision, Congress enacted a new statute dealing

---

**7.** Although *Sanders* involved a motion by a federal prisoner under 28 U.S.C. § 2255, rather than an application for habeas corpus, the Court could find no practical or logical basis for treating successive applications differently under habeas corpus than under the motion procedure.

*Sanders v. United States*, 373 U.S. at 14, 83 S.Ct. at 1076. Thus, the guidelines established in *Sanders* are fully applicable to habeas applications by state prisoners. C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4267, at 684 (1978).

with successive habeas petitions, 28 U.S.C. § 2244 (1976). Section 2244(b) applies to state prisoners.[8] Similar provisions are contained in rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts, which became effective February 1, 1977.[9] The general effect of rule 9(b) and section 2244(b) is to codify the criteria outlined in *Sanders*. Although both rule 9(b) and section 2244(b) do not specifically refer to the "ends of justice" test, the parties here apparently agree that the test has been implicitly incorporated. We assume, without deciding, the correctness of this position.[10]

**B. Is the Claim of Bias the "Same Ground" Raised and Determined in the Prior Habeas Petition?**

■ With respect to the first consideration set forth in *Sanders*, we must consider whether Walker's claim of bias of the trial judge is the same ground as that presented in the earlier application. Walker argues that the tone of voice and demeanor of the trial judge were not considered by either the district court or this court in ruling upon the earlier habeas petition.

*Sanders* states:

By "ground," we mean simply a sufficient legal basis for granting the relief sought by the applicant. For example, the contention that an involuntary confession was admitted in evidence against him is a distinct ground for federal collateral relief. But a claim of involuntary confession predicated on alleged psychological coercion does not raise a different "ground" than does one predicated on alleged physical coercion. In other words, identical grounds may often be proved by different factual allegations. So also, identical grounds may often be supported by different legal arguments ... or be couched in different language ... or vary in immaterial respects .... Should doubts arise in particular cases as to whether two grounds are different or the same, they should be resolved in favor of the applicant.

*Sanders v. United States*, 373 U.S. at 16, 83 S.Ct. at 1077.

So tested, Walker's claim of bias of the trial judge in his present petition is the same "ground" as raised and determined in the prior application. The district court in the first habeas hearing considered whether the trial judge's allegedly prejudicial remarks during the course of the trial and in the presence of the jury constituted a denial of due process. *Walker v. Bishop*, 295 F.Supp. at 773. On appeal this court care-

---

**8.** Section 2244(b) provides:

When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ.

**9.** Rule 9(b) provides:

A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

**10.** The effect of omitting reference to the "ends of justice" is unclear. *See* S.Rep. 1797, 89th Cong., 2d Sess., *reprinted in* 1966 U.S.Code Cong. & Ad.News 3663, 3664 (newly discovered evidence a consideration in applying section 2244(b); no reference to *Sanders* or "ends of justice"). *Compare* 28 U.S.C. § 2244(a) (1976) (statute, applicable to federal prisoners, incorporates "ends of justice") *with id.* § 2244(b) (statute, applicable to state prisoners, omits "ends of justice"). *See* generally 17 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4267, at 691 (1978) (rule 9 does not require dismissal if ends of justice dictate new determination); R. Popper, *Post-Conviction Remedies in a Nutshell* 185 (1978) (rule 9 fails to go as far as *Sanders*).

Despite the omission, substantial discretion remains in the federal courts. Section 2244(b) provides that a new application "need not be entertained." Further, the Advisory Committee Note to rule 9(b) states: "*Sanders*, 18 U.S.C. § 2244 [sic], and subdivision (b) make it clear that the court has discretion to entertain a successive application.... The bar set up by subdivision (b) is not one of rigid application, but rather is within the discretion of the courts on a case-by-case basis."

fully reviewed this claim and determined as follows:

> The Supreme Court of Arkansas, which we highly respect, concluded that the trial court acted properly and even generously towards Walker in the course of the second trial, and that the judge exhibited no personal bias or prejudice to the jury. That court, among other things, noted that defendant was given seven months to prepare for the second trial, that his motion to be placed in the county jail during that time for the convenience of his counsel was granted as was what the Arkansas court characterized as defendant's "sweeping motion for production and private examination of all the tangible objects which were to be introduced by the State in evidence."

*Walker v. Bishop,* 408 F.2d at 1382.

This court also specifically considered the statements made by the state trial judge some months before trial to a minister and two companions who sought his permission to take Walker to church for baptism. Although granting the request, the trial judge had warned the deputy sheriff to see that Walker was heavily guarded and to shoot him if he attempted to escape. [R. II, 83.] The trial judge also had said that he intended to "burn the S.O.B. anyway." [R. II, 83.] In considering these statements, this court concluded as follows:

> [A]ny such innermost thoughts on the part of the judge constituted no cause for his disqualification. The judge said that he could give defendant a fair trial. The Supreme Court of Arkansas held that there was no showing of bias or prejudice and the defendant was accorded a fair trial. Chief Judge Henley, the United States district judge, made the same finding in the habeas proceeding, and our canvass of the entire record of the second trial in addition to the voluminous habeas record compels the same conclusion on our part.

*Walker v. Bishop,* 408 F.2d at 1382.

In asserting that the tone of voice and demeanor of the trial judge were not considered, Walker is simply making a different factual allegation to prove the identical ground of bias or prejudice of the trial judge. Although the decisions of the district court and of this court do not specifically refer to the tone of voice or demeanor of the trial judge, nor does the decision of the Supreme Court of Arkansas, Walker's counsel at the second trial raised this objection out of the presence of the jury. [R. II, 294–95.] Walker's counsel apparently did not follow up and further urge the error asserted in this objection. It is clear from the rulings of the Supreme Court of Arkansas, the district court, and this court that the entire record was carefully reviewed and that bias and prejudice were not found. Because the same ground was presented in the prior application and was determined on the merits, the district court properly refused to consider once again the claim of bias or prejudice of the trial judge.

### C. Will the "Ends of Justice" Be Served By Redetermining the Same Ground?

The next question under *Sanders* is whether the "ends of justice" would be served by redetermining Walker's claim of bias of the state trial judge. *Sanders* gives instruction as to the considerations to be weighed:

> Even if the same ground was rejected on the merits on a prior application, it is open to the applicant to show that the ends of justice would be served by permitting the redetermination of the ground. If factual issues are involved, the applicant is entitled to a new hearing upon showing that the evidentiary hearing on the prior application was not full and fair; we canvassed the criteria of a full and fair evidentiary hearing recently in *Townsend v. Sain,* [372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963)], and that discussion need not be repeated here. If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application. Two further points should be noted. *First,* the foregoing enumeration is not intended to be exhaustive; the test is "the ends of justice" and it cannot be too finely particularized. *Second,* the burden is on the applicant to show that, although the ground of the new application was determined against him on the merits on a prior application, the ends of justice would be served by a redetermination of the ground.

*Sanders v. United States,* 373 U.S. at 16–17, 83 S.Ct. at 1077–78 (emphasis in original). Walker does not contend that the evidentiary hearing on the first habeas corpus was not full and fair. Rather, Walker contends that the ends of justice test is

satisfied because of an intervening change of law, or alternatively because of an insufficiency of evidence upon which to rest his conviction. The first strand of Walker's ends of justice argument—an intervening change of law—is a consideration specifically enumerated in *Sanders.* The second strand of his argument—insufficiency of the evidence—is asserted under the catch-all language in *Sanders* that the ends of justice "cannot be too finely particularized." We consider each of these contentions in turn.

*Intervening Change of Law.* Walker argues that the intervening change in the law regarding judicial bias springs primarily from *United States v. Brown,* 539 F.2d 467 (5th Cir.1976) (per curiam). In the habeas hearing in *Brown,* a lawyer reported that some time before Brown's trial, at a state bar association meeting, the trial judge, while sitting around a swimming pool on motel grounds, said that he was going to preside at Brown's trial and that he was "going to get that nigger." *Id.* at 468. A different district judge, in the habeas hearing, concluded that the remark had been made and that it cast a serious shadow on the case as far as the appearance of justice was concerned. He reviewed the record, however, and found that Brown had received a fair trial.

The United States Court of Appeals for the Fifth Circuit reversed. The court observed that the record would not reflect the tone of voice of the judge, his facial expressions, or his unspoken attitudes and mannerisms, all of which might have affected the jury and its verdict. The court further observed the language of the United States Supreme Court in *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), that "justice must satisfy the appearance of justice." From this Walker argues that the appearance of justice standard, which is objective in nature, is a change in the law satisfying the ends of justice consideration in *Sanders.* Walker's further argument, that a review of the trial record under such circumstances is not required, is answered by the court's conclusion in *Brown:* "The judge's statement did not comport with the appearance of justice, and it cannot be said from the record alone that appellant received a fair trial." 539 F.2d at 470. It is apparent that the record was reviewed in *Brown.*

In our case we have a complete review of the trial record by the Supreme Court of Arkansas and by both the district court and this court in the earlier habeas petition, and affirmative conclusions by these courts that there was no showing of bias or prejudice or that defendant was denied a fair trial. The *Brown* court could not reach such a conclusion.

We agree with the district court that *Brown* is "unique to its own set of facts" and that it involves a first rather than a successive application for writ of habeas corpus. *Walker v. Lockhart,* 514 F.Supp. at 1350–51.

Walker argues that other decisions have adopted the appearance of justice standard as a new rule of law which is constitutionally recognized. The cases cited, *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), *Johnson v. Mississippi,* 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971), *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), and *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), deal with criminal contempt charges or jury selection procedures, and do not establish an intervening change in the law as Walker argues. The appearance of justice as a consideration in both criminal contempt and other settings goes back at least as far as *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955), in which the United States Supreme Court stated:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.... Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11.

We do not read the *Brown* per curiam, or the contempt and jury selection cases on which it relies, as establishing an intervening change in the law as it relates to the claim of bias or prejudice of the trial judge. This court has cited *Brown* only once in *United States v. Dean,* 647 F.2d 779, 783 (8th Cir.1981), *vacated,* 667 F.2d 729 (8th Cir.) (en banc), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). The panel decision in *Dean* reversed because of juror bias, but this court en banc affirmed on a different ground and made

no reference to *Brown.* *Dean* cannot be said to recognize *Brown* as an intervening change of law.[11]

■ *Sufficiency of the Evidence.* Walker alternatively argues that the ends of justice would be served by reexamining the bias issue, based on the weakness, or insufficiency, of the evidence giving rise to his conviction. Walker argues that sufficiency of the evidence falls within the Supreme Court's broad definition in *Sanders* that the ends of justice "cannot be too finely particularized." He launches upon an extensive factual argument, the essence of which is that because of various conflicts in the evidence and various claims of suppressed evidence, there is no factual basis to support the jury's verdict. Although he does not specifically refer to the sufficiency of the evidence rule as established in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in his briefs, his counsel stated at oral arguments that he would rely or stand on it.

Sufficiency of the evidence was not raised in the original application for writ of habeas corpus considered by the district court in 1967[12] and by this court in 1969, nor was it raised in the second petition considered by the district court in 1981. Thus, we do not consider sufficiency of the evidence as a distinct ground raised by Walker. Nonetheless, we are persuaded to consider this argument because of the Supreme Court's broad definition of the "ends of justice" in *Sanders* and because of appellant's counsel's enthusiastic adoption of sufficiency of the evidence as an additional ends of justice consideration. At least two further reasons support this action. Appellant unequivocally states that this court can properly rule on the habeas corpus petition on the record before us, which he says is adequate for this court to determine the questions of law. We also believe that finality of decision in this case further justifies our review of this argument.

In evaluating the sufficiency of the evidence, we are satisfied that the only standard that we can use is that expressed in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [13] *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original); *see, e.g., Gipson v. Lockhart,* 692 F.2d 66, 68 (8th Cir.1982) (per curiam); *Fowler v. Parratt,* 682 F.2d 746, 751 (8th Cir.1982); *Lenza v. Wyrick,* 665 F.2d 804, 812 (8th Cir.1981).

Walker and his counsel are convinced that there is no evidence to establish Walker's guilt. The brief boldly states, "Certainly, there is nothing which would be called a fact which explains the jury verdict." Walker's argument, which is accepted by the dissent, is essentially based on considering all of the conflicting evidence and conclusions drawn most favorable to Walker. His argument totally ignores the following evidence:

First, Linda Ford, the passenger in the middle seat of the Oldsmobile driven by Kumpe, testified that after she was pushed into the car Walker sat to her right with a gun on her. [R. II, 605.] When the car stopped at the scene, Ford saw Officer Vaughan approach the passenger side of the car and saw that Walker still had the pistol out. [R. II, 607–08.] When the door opened, Walker started firing. [R. II, 608.] She then heard several shots. [R. II, 608.] She knew that Walker had fired first because she could see the fire from Officer Vaughan's gun when he fired. [R. II, 609.]

Second, Thomas Short, the cab driver who arrived on the scene almost contempo-

11. *Brown* has been cited in at least fourteen courts of appeals decisions, none of which recognizes *Brown* as an intervening change of law.

12. The district court in the first habeas proceeding observed as follows:

The evidence produced at both trials was ample to justify the findings of both juries that Walker killed Vaughan willfully, maliciously, and with premeditation and deliberation, although the question of his guilt or innocence was for the jury, and the second jury might well have come to a different conclusion.

*Walker v. Bishop,* 295 F.Supp. at 771. Whether this finding is a clear determination of sufficiency of the evidence that would bar reconsideration of this issue, we need not determine. Our analysis would be essentially the same as it is when we examine the evidence to determine whether the "ends of justice" test has been met, and our conclusion would be the same under whichever justification we used to approach the question.

13. *Jackson v. Virginia* overruled the "no-evidence" test of *Thompson v. City of Louisville,* 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960), which allowed relief only upon a showing that the state court conviction was totally devoid of evidentiary support.

raneously with Officer Vaughan, saw Vaughan approach the passenger side of the Oldsmobile and bend over looking into the window to talk to someone. [R. II, 518; H. I, 293–94.] After a few seconds, the car door suddenly opened. [R. II, 518.] Officer Vaughan jumped backwards, pulling his gun as he did so. [R. II, 518; H. I, 295.] While Vaughan was dancing backwards, Short heard a shot and saw Vaughan's feet fly out from under him. [R. II, 518.] Further shots rang out. [R. II, 519.] Altogether, Short heard one shot and a pause and then four or five more shots fired in succession, "real rapid like." [H. I, 295.] After the shooting was over, Short walked around and saw one of the police officers kick a gun out of Walker's hand. [H. I, 298.] When Walker was turned over, Short saw another gun underneath him. [H. I, 299.]

Finally, Captain Paul McDonald, a qualified ballistics expert, testified that the bullet removed from Officer Vaughan's body matched the four-inch barrel .38 caliber Smith & Wesson, [R. II, 767], which was identified as the weapon found under Walker. *Walker v. Bishop*, 295 F.Supp. at 771. In making that determination, Captain McDonald examined two other revolvers. [R. II, 737–38.] One was a fully-loaded two-inch barrel .38 caliber Smith & Wesson, which was observed being kicked away from Walker after the shooting. 295 F.Supp. at 771. The other was a four-inch barrel Colt .38, which was found under the front seat of the Oldsmobile. *Id.* at 772. Because of the differences in class characteristics, it was readily ascertained that the bullet which killed Officer Vaughan did not come from the Colt .38. [R. II, 768.] A microscopic study of samples obtained from the two Smith & Wessons led to a positive identification that the fatal bullet came from the four-inch Smith & Wesson. [R. II, 768–69.] Captain McDonald testified that he had no doubt about the identification. [R. II, 769.]

■ After viewing this evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319, 99 S.Ct. at 2789.

Walker points to a number of inconsistencies. He argues vigorously that "It is absolutely transparent that [he] could not have shot Vaughan *after* he sustained [five shots to his body].... [N]o one at any time ... has ever suggested that the riddled and unconscious Walker could have shot Vaughan." However, "[i]f Walker shot Vaughan, he had to do it before Vaughan shot him, but this means a man (Vaughan) who took a shot at the heart ... was able to ... fire five bullets into his assailant." In asserting the "inherent improbability" of this theory, Walker relies principally on a statement in the autopsy report that "Death was presumably almost immediate." [R. II, 734 (Defendant's Exhibit "B").] In doing so, however, Walker ignores the testimony of the pathologist who prepared that report. Dr. Davenport, the pathologist, testified that Officer Vaughan's death was not instantaneous and that "immediate" meant to him "anything from a minute to a few minutes." [R. II, 759.] During that length of time, Officer Vaughan could have fired shots. [R. II, 760.]

Walker also argues that the only gun that he had was in his right hand fully loaded. He argues that when Vaughan first approached the car he held the gun in his hand above his head to show that he was submitting to the law. There is no evidence in the record that Walker ever placed his hands above his head. An offer of proof in this respect was rejected by the district court in the 1981 habeas hearing. [H. II, 311–12.] Walker in the second trial simply denied that he had shot Vaughan or that he had ever fired a shot at the scene of the shooting. [R. II, 854–55.] He did not testify to raising his hands above his head. He also gave no such testimony in the first habeas hearing.

Other issues that Walker raises have been treated extensively in earlier opinions. These issues include: the sawed-off Barentine gun;[14] the allegation that Barentine gave perjured testimony;[15] the alleged suppression of the Alderman testimony;[16]

---

14. *Walker v. Bishop*, 295 F.Supp. 767, 774 (E.D. Ark.1967).

15. *Walker v. Bishop*, 408 F.2d 1378, 1387–88 (8th Cir.1969); 295 F.Supp. at 777.

16. 408 F.2d at 1387; 295 F.Supp. at 777–80.
 The dissent finds prejudice in the alleged suppression of Alderman's testimony. In the first habeas corpus proceeding, however, the district court expressly found that the State was not guilty of suppression or nondisclosure as far as

the failure to conduct a paraffin or fingerprint test on the weapon found under Walker;[17] the unavailability of Linda Ford and Mary Roberts to testify at the second trial;[18] the recantation of Mary Roberts' testimony;[19] and the report of defendant's absent ballistics expert.[20]

In reviewing the record available to us, we conclude that the determinations made by the district court at the first habeas hearing, this court on appeal from its decision, and the decision of the Arkansas Supreme Court following the second conviction, were conclusions fully supported not only by the record before those courts but also by the record before us. This makes appropriate the comments of the district judge in the first habeas hearing that conflicts in the testimony were to be resolved by the jury:

> This case involved the death of a police officer in line of duty; witnesses in the case included fellow officers of the deceased; two prostitutes and one cab driv-

er. The fatal events occupied only a few seconds at most and took place during hours of darkness; all of the survivors were obviously frightened and excited. In such a situation serious credibility problems inevitably arise....

The two juries which tried Walker were certainly aware that they were faced with problems of credibility. Both juries were satisfied beyond a reasonable doubt from all of the evidence that petitioner was guilty of first degree murder. The ultimate judgment in the case is not lightly to be set aside in a collateral proceeding such as this by a mere reiteration of arguments already addressed unsuccessfully to the jury or by a mere assertion that the State's witnesses perjured themselves and that the State knew it.

*Walker v. Bishop,* 295 F.Supp. at 776–77. We conclude, even considering these inconsistencies,[21] some of which were not in

---

Alderman was concerned. 295 F.Supp. at 780. The district court was not able to conclude that Alderman had made a formal statement, and found that his testimony was at variance with that of all the other eyewitnesses who testified at trial. *Id.* at 779. Interestingly, the dissent stresses Alderman's testimony that when the shooting began, Kumpe went under the Oldsmobile. The other witnesses, Short and Barentine, stated that Kumpe fled from the scene when the shooting commenced and ran into some bushes or a ditch some distance away. [R. II, 519–21, 660–61.]

**17.** 295 F.Supp. at 780.

**18.** 408 F.2d at 1384–87; 295 F.Supp. at 775–76; *Walker v. State,* 241 Ark. 663, 665–69, 408 S.W.2d 905, 918–20 (1966) (McFadden, J., with Bland, J., dissenting in part).

The dissent finds prejudice in Judge Kirby's refusal to grant a thirty-minute recess so that defense counsel could attempt to locate the two women. In the first habeas corpus proceeding, the district court found that the State had subpoenas issued for both women well in advance of the second trial, that the State had made good faith and reasonable efforts to locate both women, and that the State had nothing to do with the fact that the women were not present at the second trial. 295 F.Supp. at 776. This court accepted these findings and observed that the defense had ample time to produce the witnesses if counsel knew of their whereabouts. 408 F.2d at 1385. It is evident that defense counsel, after informing the trial court that the women could be seen and found, had from December 1 to December 3, 1965 to obtain a subpoena for these witnesses but did not do so. 241 Ark. at 667, 408 S.W.2d at 919.

**19.** 241 Ark. at 669–70, 408 S.W.2d at 920–21.

**20.** 295 F.Supp. at 773–74; *Walker v. State,* 241 Ark. 300, 307–08, 408 S.W.2d 905, 910–11 (1966).

The trial court had ordered the defendant's ballistics report to be filed as part of the proceedings, but not to be admitted as evidence. In the first habeas corpus proceeding, Walker argued only that requiring him to furnish a copy of the report violated his privilege against self-incrimination. 295 F.Supp. at 774. The dissent now finds the exclusion of the report to be a "crucial ruling" that exemplifies Judge Kirby's prejudice. We cannot find bias in this ruling. The unremarkable order to complete the record did not commit Judge Kirby to admitting the report into evidence. The report was no more than answers to a list of questions prepared by defense counsel that covered only selected areas of subject matter. The defense expert was asked about dissimilarities, but not similarities, in the individual characteristics of the bullets, and was not asked whether the "Walker gun" fired the fatal bullet. 295 F.Supp. at 774 n. 5. Moreover, Walker has not demonstrated, and we are unable to discover, any basis for admission of this report, which is clearly hearsay under Arkansas law. *See New Empire Insurance Co. v. Taylor,* 235 Ark. 758, 760, 763, 362 S.W.2d 4, 6, 8 (1962); *Shearman Concrete Pipe Co. v. Wooldridge,* 218 Ark. 16, 26, 234 S.W.2d 382, 388 (1950); *Roberts v. Roberts,* 216 Ark. 453, 459–60, 226 S.W.2d 579, 583–84 (1950).

**21.** Although the dissent discusses the first trial at some length, it is the second trial, not the first trial, that is at issue. If there were any inconsistencies in testimony between the first and second trials, particularly with respect to Offi-

evidence before the jury, that any rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. at 319, 324, 99 S.Ct. 2781, 2791, 61 L.Ed.2d 560. Thus, the insufficiency of the evidence argument of Walker does not, under the ends of justice, justify reexamination of the issues raised again in the second habeas petition.

### D. Conclusion

■ The district court in its June 2, 1981 order cites and relies on two decisions of other courts of appeals that have rejected successive applications for writ of habeas corpus. In *United States ex rel. Townsend v. Twomey,* 452 F.2d 350 (7th Cir.), *cert. denied,* 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98 (1972), the Seventh Circuit held that the district court abused its discretion in reconsidering grounds in a habeas application that were previously determined, stating that "[w]hile the writ should never be denied in the proper case, judicial economy dictates restrictive limitations on re-runs." *Id.* at 357. Similarly, the Second Circuit in *United States ex rel. Schnitzler v. Follette,* 406 F.2d 319 (2d Cir.), *cert. denied,* 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969), held that the district court was bound to follow the court of appeals' prior decision on a habeas corpus application, rendered upon a factual and legal background identical to that before the district court. Chief Judge Lumbard observed that federal habeas corpus jurisdiction over state prisoners is "a branch of criminal jurisprudence which is badly in need of some principles of finality." *Id.* at 322.

The tests of *Sanders* were applied in both *Twomey* and *Follette* as they were by the district court in this case. A final word from *Sanders* is appropriate:

> The principles governing ... denial of a hearing on a successive [habeas] application are addressed to the sound discretion of the federal trial judges. Theirs is the major responsibility for the just and sound administration of the federal collateral remedies, and theirs must be the

judgment as to whether a second or successive application shall be denied without consideration of the merits. Even as to such an application, the federal judge clearly has the power—and, if the ends of justice demand, the duty—to reach the merits.... We are confident that this power will be soundly applied.

*Sanders v. United States,* 373 U.S. at 18–19, 83 S.Ct. at 1078–79.

We conclude that the district court properly ruled that the several grounds should not be reconsidered, and properly refused to hear additional testimony on these grounds.

This case presents a classic example of an effort to have a second consideration of issues once painstakingly decided. There is no reason to believe that what the district court decided in 1967 and what this court decided in 1969 can be decided better today. What we have is a persistent effort to present the same arguments in the hopes that at some point another judge or group of judges will consider the case in a more sympathetic light. In his concurring opinion in *Jackson v. Virginia,* 443 U.S. 307, 337 n. 12, 99 S.Ct. 2781, 2798 n. 12, 61 L.Ed.2d 560 (1979), Justice Stevens quotes at length from Professor Bator's article, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners,* 76 Harv.L.Rev. 441, 451 (1963), as follows:

> The presumption must be, it seems to me, that if a job can be well done once, it should not be done twice. If one set of institutions is as capable of performing the task at hand as another, we should not ask both to do it. The challenge really runs the other way: if a proceeding is held to determine the facts and law in a case, and the processes used in that proceeding are fitted to the task in a manner not inferior to those which would be used in a second proceeding, so that one cannot demonstrate that relitigation would not merely consist of repetition and second-guessing, why should not the first proceeding "count"? Why should we duplicate effort? After all, it is the very purpose of the first go-around to

---

cer Barentine, we are satisfied that these issues were thoroughly developed on cross-examination at the second trial. Further, we are in full agreement with the conclusions reached by Chief Judge Henley that there is nothing in the record to suggest that evidence was suppressed at the first trial. 295 F.Supp. at 775. The dissent so suggests, and overlooks Chief Judge

Henley's observations that the defense knew or was on notice that Vaughan had shot Walker and knew or should have known that supporting ballistics evidence was available. *Id.* Chief Judge Henley also observed that the defense on more than one occasion was on the verge of asking the simple question of whether Vaughan was doing any shooting, but did not. *Id.*

decide the case. Neither it nor any subsequent go-around can assure ultimate truth. If, then, the previous determination is to be ignored, we must have some reasoned institutional justification why this should be so.

... What seems so objectionable is second-guessing merely for the sake of second-guessing, in the service of the illusory notion that if we only try hard enough we will find the "truth."

There is every reason to reject Walker's efforts to have the initial determination of the district court and of this court be second-guessed. As Justice Harlan once observed:

Both the individual criminal defendant and society have an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community.

*Sanders v. United States*, 373 U.S. at 24–25, 83 S.Ct. at 1081–82 (Harlan, J., with Clark, J., dissenting).

Consideration of the ends of justice involves not only the interest of the accused in justice but the interest of the public in justice. The incident that gave rise to Walker's conviction occurred nearly twenty years ago. Retrial would in all likelihood be an impossibility. These considerations, as well as the *Sanders* analysis, support the refusal of the district court to retry the issues so carefully decided.

## II. Additional Grounds Asserted

In its June 2, 1981 order, the district court granted an evidentiary hearing on the new or additional grounds asserted in Walker's second petition for writ of habeas corpus. *See Walker v. Lockhart*, 514 F.Supp. at 1353. These were: (1) newly discovered evidence that would exonerate Walker; (2) a denial of due process because of an alleged inducement by state authorities not to apply for a writ of certiorari following this court's ruling in 1969; and (3) a denial of effective assistance of counsel because of alleged intimidation of Walker's counsel by the trial judge and by police officers and other officials.

The district court heard evidence on only two of the three grounds since the claim of newly discovered evidence was candidly abandoned at the outset of the hearing. [H. II, 173–74.] The district court considered Walker's due process claim and found it to be without merit. Although Walker's counsel decided to abandon this claim following presentation of the evidence, the district court found there was no credible evidence in the record to report it. [H. II, 365, 499.]

Finally, the district court ruled that Walker's claim of ineffective assistance of counsel was unsustainable. At the habeas hearing Walker's former counsel who had assisted in representing him at trial clearly testified that he was not intimidated. [H. II, 369, 500.] The district court found that Walker had received an excellent defense by two experienced attorneys, that there was no intimidation by the trial judge or by the North Little Rock Police Department, and that Walker's defense had been praised in glowing terms by this court. [H. II, 499–500.]

Walker does not seriously urge error in these findings. After carefully reviewing the record, we conclude that these findings of the trial court were not clearly erroneous. Fed.R.Civ.P. 52(a); *see Weiland v. Parratt*, 530 F.2d 1284, 1289 (8th Cir.), *cert. denied*, 429 U.S. 847, 97 S.Ct. 130, 50 L.Ed.2d 118 (1976).

The orders of the district court denying the writ of habeas corpus are affirmed.

ARNOLD, Circuit Judge, concurring.

I join the opinion of the Court in its entirety, and deem it appropriate to add a few words.

The trial judge was prejudiced. We know this because of his own statements, which are of record. Ordinarily no further inquiry would be necessary. Nothing else would matter. If due process means anything, it means a trial before an unbiased judge and jury. That is why I made the statement at the oral argument, quoted by my Brother Bright, *post*, p. 1252, that "if I had been on this court when this case came up before, I would have voted to grant the writ." [1]

1. My further remark that "there ought to be a reprieve," also quoted, *post*, p. 1252, was improvident. Executive clemency is not our business. The Governor has his constitutional responsibilities, just as we have ours. Having said that, I remain of the view that this case does little credit to the State of Arkansas.

In fact, of course, I was not on the Court 15 years ago, when the denial of the first habeas petition was unanimously affirmed. Only one judge who sat on the 1969 *Walker* panel is still an active Circuit Judge. Only three judges who are active Members of this Court today were on the Court then. The point is this: a judge who is today presented with a fresh issue is asked to solve a far different problem from a judge who is asked to repudiate the opinion of his own Court on the very question now before him. In the latter instance, the question is not simply, "Did James Dean Walker get a fair trial?," but rather, "Did the United States Court of Appeals for the Eighth Circuit, when it held, on the fullest consideration and after an evidentiary hearing, that James Dean Walker got a fair trial, err so egregiously that the ends of justice require the same Court, 15 years later, to come to the opposite conclusion?" It is not a question, then, of simple agreement or disagreement with this Court's prior position. (I suspect that, but for the fact that I have other work to do, I could leaf through any volume of the *Federal Reporter* and find at least one opinion of this Court with which I disagree.) Something more than mere disagreement must be shown to justify a successive habeas petition.

What is that something more? *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), gives some examples, but none of them applies here. There is no new evidence, unrevealed at the time of the first habeas proceeding. There is no change in the law. There is of course no claim of taint in the first post-conviction proceeding. There is simply the claim that this Court in 1969 misapplied the law to the facts. I know of no case that grants a successive habeas petition in that situation. (*United States v. Brown*, 539 F.2d 467 (5th Cir.1976), relied on by the dissenting opinion, *post*, pp. 1258–59, was a *first*, not a successive, petition for post-conviction relief.) No doubt there may be such a case some day, but this one should not be it, for several reasons.

First, I am not persuaded that the trial judge's bias did Walker any actual harm that would not have occurred if the case had been tried by another judge. The judge did deny a short recess, desired by defense counsel to enable them to try to show that two witnesses "could be found nightly in Little Rock nightclubs," *post*, p. 1256. But this incident occurred near the beginning of the State's case. If in fact the availability of the witnesses Ford and Roberts could have been shown in such short order, would not defense counsel have gone out that very night, found witnesses who knew Ford and Roberts were in town, and presented them in chambers the next morning in support of a motion to strike or for a mistrial? If in fact Ford was available, and if her testimony in person would have differed from the transcript of the first trial, would counsel not have found her and demolished the prosecution by calling her as a defense witness? Perhaps not, but the likelihood is sufficiently great to persuade me that the denial of the 30-minute continuance was not in fact so crucial in the second trial as the dissenting opinion argues.

As to the defense ballistics report, I simply have no fault to find with the trial judge's ruling. It was hearsay and not admissible on any theory. The trial court's order that the report be made "part of the record," whatever it may mean, simply cannot reasonably be read as a stipulation by the prosecution that the report could be read to the jury. No prosecutor in his right mind would agree that an *ex parte* examination of an expert hired by the defense be admitted into evidence, at least without some substantial concession in return.

Finally, I return to the dispositive standard, "the ends of justice." Certainly justice to the petitioner is crucial in our system. But he is not the only party to the case. The State also has a right to fairness, and we have to consider as well the effect on the administration of justice as a whole of a decision to grant this successive application. Petitioner has, after all, been convicted by a jury, on evidence that meets the *Jackson v. Virginia* standard. He does not claim that the jury was biased. It would be difficult, if not impossible, for the State to retry him at this point. An error may be sufficiently grave to cause a reversal on direct appeal, or on the first habeas application, but not sufficiently grave, when weighed in the balance with all the other constituent elements of "justice," to justify relief on a successive habeas application. In my view, that is the category in which the error committed here fits.

Accordingly, although there is much to admire in the dissenting opinion, denial of the writ seems to me less unjust than granting it. I vote to affirm the judgment

of the District Court, and I join Judge John R. Gibson's cogent opinion for this Court *en banc*.

LAY, Chief Judge, dissenting.

I join in Judge Bright's dissent but I write separately in rejoinder of Judge Arnold's concern. I too am reluctant to review a prior holding of this court on the basis of a successive petition raising the same ground. Normally, unless the "ends of justice" require it, we need not and should not do so. However, as Justice Harlan earlier pointed out, federal courts should not have a fetish about finality when life or liberty is at stake and when there are demonstrable reasons to reopen the proceedings.[1]

Notwithstanding Judge Arnold's affirmation of what he says has occurred, Walker's present petition for a writ of habeas corpus is not now denied by this court because of the successive petition doctrine. Had this been the court's holding by a short opinion or order, I might have joined it. But notwithstanding whatever rubric the majority has chosen to use, the fact is that Judge Gibson's opinion has not followed the successive petition rule, but has painstakingly analyzed the entire record concerning both trials and all postconviction proceedings.

The successive petition rule is designed to dispose of frivolous litigation, to conserve judicial energies, and to provide some degree of repose and confidence in the prior judicial proceedings. It must turn as well on the presumption that a grouping of new judges should not be any more qualified to pass judgment than those who preceded us.

But this is not what has happened here. For two years now this entire court (*en banc*) has been engaged in record analysis: sifting, probing, rescreening, examining, and reexamining hundreds of pages of records. The judicial energies intended to be protected and conserved under the successive petition doctrine have long ago been expended by all of the judges of this court. Why? I think the reasons should be obvious why this court has given plenary review to these proceedings:

1) Our prior judgment, *Walker v. Bishop*, 408 F.2d 1378 (8th Cir.1969), did not delineate in detail the obvious inconsistencies and deficiencies in the evidence, now so ably discussed by Judge Bright. When these facts were illuminated by present counsel it gave all judges on this court cause for concern as to Walker's guilt or innocence.

2) The sufficiency of evidence in light of the *overall* record had never been analyzed as has now been done by the majority and dissenting judges.

3) The obvious error of the Arkansas Supreme Court and of this court relating to the question of bias and prejudice of the trial judge is made apparent *when viewed in light of the inconsistent and deficient evidence surrounding Walker's conviction*.

4) Subsequent to our earlier holding, the intervening decisions of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), were decided by the Supreme Court of the United States. As the majority points out, the sufficiency of evidence in the second trial was not raised as an independent ground in the district court or in this court. (I feel the majority errs in attempting to resolve this issue when it has not been presented to the district court nor briefed as an independent ground in this court). However, the relevance of *Jackson* and *Agurs* has been the primary cause for the searching study of the record (a first in any postconviction proceeding in this case) as it relates to the judicial bias question and the suppression of material evidence. These issues were not determined and not analyzed in our prior decision; the *overall* evidence of the record, in terms of whether a rational trier of fact could hold *beyond a reasonable doubt* that Walker is guilty, was not taken into account. Prior to *Jackson* and *Agurs*, a federal court could only review a state court record in terms of whether there existed any evidence to sustain a conviction. Surely the new standards of review require a much more searching analysis of the record when reviewing collateral issues of judicial bias and suppression of evidence. When this is done, it is difficult for me to say that the "successive petition" doctrine has in any way been offended.

---

**1.** *Sanders v. United States*, 373 U.S. 1, 24, 83 S.Ct. 1068, 1081, 10 L.Ed.2d 148 (1963) (Harlan, J., dissenting).

BRIGHT, Circuit Judge, dissenting, joined by LAY, Chief Judge, and HEANEY and McMILLIAN, Circuit Judges.

We dissent.

Walker's murder conviction rests upon the highly implausible theory that Officer Vaughan, having taken a fatal bullet wound to the heart, could thereafter fire six shots and wound Walker five times. Our examination of the lengthy records of Walker's two trials and two habeas corpus hearings leads us to the inescapable conclusion that a great injustice has been done and that Walker is entitled to habeas relief. This miscarriage of justice rests primarily upon two substantial grounds: (1) the admitted prejudice of Judge William C. Kirby, the trial judge who presided over both of Walker's trials, and who manifested his prejudice through several crucial rulings against Walker, thereby ensuring that the jury would not hear the whole story; and (2) the actions of the prosecutors and police, who suppressed crucial evidence that could very well have established the falsity of the state's entire case against Walker. Moreover, the record as a whole indicates the strong probability that Walker did not shoot Vaughan.

These may be bold statements to make about an eighteen year-old conviction that has been reviewed and affirmed by the Arkansas Supreme Court, *Walker v. State,* 241 Ark. 300, 408 S.W.2d 905 (1966); by two federal district courts, *Walker v. Lockhart,* 514 F.Supp. 1347 (E.D.Ark.1981) and *Walker v. Bishop,* 295 F.Supp. 767 (E.D. Ark.1967); and by this court, *Walker v. Bishop,* 408 F.2d 1378 (8th Cir.1969). Yet, if these statements ring true, the public's, as well as the courts', interest in the finality of criminal convictions must give way to the more important concern of ensuring justice to a person who, having been convicted of a crime in an unfair trial, does not on the whole record appear to be guilty beyond a reasonable doubt. Here, Walker's filing of a successive application for writ of habeas corpus provides this court with the proper means of rectifying a gross miscarriage of justice. We would issue the writ.

We note that Judge Heaney, who joins in this dissent, served on the panel of this court which affirmed the denial of Walker's first petition. *Walker v. Bishop, supra,* 408 F.2d at 1378 (1969). His joining this opinion serves to emphasize that the previous panel erred and that the important interest of finality should, in this case, give way to the more important interest of righting a grievous, eighteen-year miscarriage of justice.

The three other judges who join this dissent also believe that the prior panel of this court made a mistake in 1969 in affirming the denial of Walker's initial petition for a writ of habeas corpus. Additionally, one judge who votes with the majority in the present proceeding also seems to agree that the prior panel erred. Judge Arnold, in a colloquy with the attorney for the State of Arkansas during the oral argument of this appeal, said in open court,

Here, you have got a case where the [trial] judge was prejudiced. We all know that. All you are telling us is that it didn't make any difference. But I am telling you that *if I had been on this court when this case came up before, I would have voted to grant the writ.* I don't see, I just don't see how the State of Arkansas can justify [it]. I understand the legal points you are making. They may be right, and that's what we are going to vote on. But with a record like this, with a judge that is prejudiced, really there ought to be a reprieve. [Statement of Judge Richard S. Arnold, transcript of November 29, 1983 oral argument (emphasis added).]

After counsel for the State responded that a reprieve was a matter for the Governor, Judge Arnold added:

It is for counsel for the State to advise the Governor, but what he does is his business. I just don't see how you can say, or maybe you are not saying this. You are not saying the judge was not prejudiced. [*Id.*]

Thus one of the five votes constituting the majority that today denies Walker relief from an unfair trial before an admittedly prejudiced trial judge rests on timing—on the belief that it is now too late to rectify a mistake made in 1969 by a prior panel of this court and that the court has no right or obligation to correct the error that unjustly imprisons Walker now, and perhaps forever. Despite the highly questionable evidence of guilt, Walker may remain in prison for the rest of his life. His case has become a *cause celebre* in Arkansas, and his attorneys inform us that at Walker's parole hearings busloads of police attended to protest his possible release. Walker has been denied parole on every application.

In this case, the usual notions of finality should give way to the interests of justice. As the United States Supreme Court has said:

> Conventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged. If "government ... [is] always [to] be accountable to the judiciary for a man's imprisonment," *Fay v. Noia,* * * * [372 U.S. 391, 402, 83 S.Ct. 822, 829, 9 L.Ed.2d 837 (1963)], access to the courts on habeas must not be thus impeded. The inapplicability of *res judicata* to habeas, then, is inherent in the very role and function of the writ. [*Sanders v. United States, supra,* 373 U.S. at 8, 83 S.Ct. at 1073.]

In support of habeas relief, this dissent advances four propositions:

1) It is proper for this court sitting *en banc* to entertain Walker's successive habeas petition.

2) The expressed prejudice of Judge William C. Kirby, the state trial judge who presided over both of Walker's trials, infected Walker's second trial to such an extent that the conviction should be set aside.

3) The record in this case clearly shows that the prosecution withheld crucial evidence at Walker's trials, and that the withheld evidence, as it later surfaced, demonstrates that Walker was, in all probability, wrongly convicted.

4) After examining the full record, taking into account the evidentiary matters tainted by Judge Kirby's manifest prejudice and the evidence suppressed by the prosecutors or police, no rational trier of fact would find Walker guilty.

I. *The Appropriateness of Entertaining En Banc This Successive Petition for Writ of Habeas Corpus.*

Walker appealed the 1981 district court order denying his second petition for a writ

of habeas corpus and dismissing his claim under 42 U.S.C. § 1983. Initially, a panel of this court consisting of Judges Heaney, Bright, and Ross heard oral argument in this appeal. The panel referred the matter to the court *en banc,* which agreed to hear, and then actually heard, renewed oral argument in this appeal. Subsequently, the case was argued again before a second, and different, *en banc* court under circumstances related in the addendum following this dissent.

Several considerations justify the initial *en banc* review in this case. In the event Walker successfully establishes a basis for habeas relief, as we believe he has, the court, to grant relief, must directly contravene the decision of one of its panels. Under the Eighth Circuit's practice, a panel must follow prior panel precedent, and only the court *en banc* can overrule the prior decision of a panel. Remedying errors committed by a panel in a previous case represents a significant departure from the normal appellate process and should be taken only in the extremely rare case in which the petitioner can demonstrate constitutional errors of great magnitude.

We are all aware of the ever-growing caseloads that have inundated the federal courts. The procedure adopted in this case—under which a previous denial of habeas relief will be reconsidered only when the court *en banc* deems it appropriate—will assure that only the most exceptional of cases will be heard more than once. In all but such extraordinary cases, successive petitions for habeas corpus can be disposed of summarily. Thus we need not refrain from granting relief in this case for fear that our action will open the judicial floodgates to successive habeas corpus petitions.

The majority opinion, *supra* at 1241–42, correctly states the test for consideration of a second habeas petition: A court may consider a successive petition for habeas corpus when the ends of justice require it. *Sanders v. United States,* 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963).[1]

---

**1.** Following the *Sanders* decision, Congress enacted a new statute regulating successive applications for habeas relief by state prisoners. This statute, now codified as 28 U.S.C. § 2244(b) (1976), provides:

> When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of

the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier ap-

It is the "ends of justice" on which we focus here. We conclude that they justify a new review of Walker's claims, and that we should grant the writ.

## II. *Background.*

### A. *The Shooting.*

Travelling southeast on Arkansas Highway 130 in pursuit of two criminal suspects, Officer Gene Barentine stopped a white, late-model Oldsmobile driven by Russell Kumpe. Two passengers, both seated in the car's front seat, accompanied Kumpe: Linda Ford sat in the center, and Walker sat on the passenger's side. Almost immediately after Barentine stopped the car, Officer Vaughan arrived on the scene. Within minutes, taxicabs driven by Thomas Short and Aaron Paul Alderman also arrived, in time to witness events culminating in the shooting.

Barentine ordered Kumpe out of the driver's side of the car and began to search him. Vaughan approached the right side of the Oldsmobile. Gunfire then broke out on the right side of the Oldsmobile.

At this point, the precise order of events becomes uncertain. At some point during the confusion, Kumpe tried to escape. Barentine fired twice and downed him. Barentine fired four shots at Walker from the back of the Oldsmobile, radioed for help, reloaded his revolver, and fired once again.

When the shooting ended, Vaughan lay dead or near death with a bullet wound to his heart. Walker, wounded five times, lay face down beside the Oldsmobile, only a few feet from Vaughan. In his right hand Walker held a fully-loaded, snub-nosed .38 Smith & Wesson revolver. It is undisputed that this gun did not shoot Vaughan. Police also found a .38 caliber Colt revolver in the Oldsmobile. This gun was also fully loaded, and it is undisputed that it did not shoot Vaughan. Finally, police recovered a police-type weapon described as a Smith & Wesson .38 caliber revolver with a four-inch barrel. Prosecution witnesses testified that police found this gun underneath or next to Walker when he was rolled over onto his back after the shooting. A police witness described the gun as empty when found. Other testimony disputed the location where the gun was found.

### B. *First Trial.*

In the first prosecution, the State did not disclose evidence that two bullets from Vaughan's gun had been recovered from Walker's body during Walker's surgery after the shooting. The State proceeded on the theory that first Walker shot Vaughan and then Barentine and Walker engaged in a shootout through the back window of the Oldsmobile. To explain how Walker shot Vaughan the State theorized that Walker had two guns, the Smith & Wesson four-inch-barrel revolver, allegedly found underneath Walker after the shooting, and the unfired Smith & Wesson snub-nosed revolver found in Walker's right hand. The State alleged that Walker, firing first, shot Vaughan with the Smith & Wesson four-inch revolver, but somehow wound up holding only the fully-loaded snub-nosed revolver. This theory found support in the testimony of Linda Ford, age 17, who sat between Kumpe and Walker. She described Vaughan's approach to the passenger's side of the Oldsmobile: "[t]hen the door was open and [Walker] started firing." [R. I, 120.][2] On cross-examination, however, Ford conceded that she did not actually see Walker fire. [R. I, 121.]

Indeed, a careful examination of the record indicates that Ford's conclusion that Walker "fired" rested not on any direct observation of Walker, but only on Ford's having noticed no flash from the officer's gun at the time she heard the first shot:

plication for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ.

Although this statute does not mention the "ends of justice" criterion, courts and commentators have interpreted the statute as enacting the principles announced in *Sanders. See, e.g., Cancino v. Craven,* 467 F.2d 1243, 1246 (9th Cir.1972); *United States ex rel. Townsend v. Twomey,* 452 F.2d 350, 354–55 (7th Cir.), *cert. denied,* 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98 (1972); 17 C. Wright, A. Miller, & E. Cooper,

Federal Practice and Procedure § 4267, at 690 (1978); Williamson, *Federal Habeas Corpus: Limitations on Successive Applications from the Same Prisoner,* 15 Wm. & Mary L.Rev. 265 (1973).

2. References to the record of Walker's first trial will be designated throughout this opinion as R. I, ——; references to the record of Walker's second trial will be designated as R. II, ——; references to Walker's first habeas corpus proceeding will be designated as H. I, ——.

For our discussion of the State's theory at Walker's second trial, *see* Section II. D., *infra.*

Q (Cross-examination): How do you know it wasn't the officer firing?

A (Linda Ford): Because I saw him whenever he opened the door, and I could see the fire from his gun whenever he fired, and it was the first shot that I had heard. [R. I, 121.]

In addition, the first cabdriver on the scene, Thomas Short, testified that after the right door of the Oldsmobile opened, he heard a shot and Vaughan "just raised up off the ground and fell flat on his chest." [R. I, 82–83.] Short, too, conceded that he did not see shots fired, but only heard them. [R. I, 90.] Short nevertheless identified Walker at trial as the person who fired the shot [R. I, 84.], and described Vaughan's reaction when shot as follows:

When the door came open, why, he was dancing this jig, and he stepped back up on the side of the bank, and just about that time I heard a shot, and then I seen him jump off this bank there, and he just fell flat on his chest. [R. I, 84.][3]

Dr. Leo Davenport, the State's examining pathologist, repeating what he wrote in Vaughan's autopsy report, described Vaughan's death from the bullet wound as "almost immediate." [R. I, 194.] Barentine's testimony supported the State's theory that he and Walker engaged in a shootout after Walker shot Vaughan. [R. I, 194.]

This testimony, plus ballistics evidence linking the Smith & Wesson revolver allegedly found near Walker to the bullet in Vaughan's heart, represented the essence of the State's case. Walker's counsel put on an insanity defense which the prosecution easily discredited. The jury deliberated just twelve minutes, found Walker guilty, and sentenced him to death.

On appeal, new attorneys assisted Walker's trial counsel. The Arkansas Supreme Court reversed the conviction, holding that the State's use of testimony by Officer Vaughan's widow as to the kind of father and husband Officer Vaughan had been was not only irrelevant, but also prejudicial to Walker. *Walker v. State*, 239 Ark. 172, 388 S.W.2d 13 (1965).

C. *Judge Kirby's Rulings on Crucial Matters in Walker's Second Trial.*

At a pretrial hearing, Walker's counsel moved to disqualify Judge Kirby as grossly prejudiced. Counsel called three ministers affiliated with the Markham Street Baptist Church in Little Rock, who had become acquainted with Walker at religious services held in the jail. They testified that when Walker asked to become a member of their church they went to Judge Kirby's office to request that Walker be allowed to go to the church to be baptized. Testifying about the exchange the ministers had with Judge Kirby, Reverend Ray Branscum stated:

We came to the judge's office and made our request known here to Judge Kirby. Judge Kirby expressed himself in saying that he didn't have any confidence in James' profession [*i.e.,* of faith] and that he had killed a man, but he did, in turn, make the statement to Mr. Hallum [the chief deputy] that he was going to grant the request but he wanted him heavily guarded and if James made a move to shoot him down, because he didn't want him brought back to him because he intended to burn the S.O.B. anyway. [R. II, 83.]

The testimony of the two other ministers substantially paralleled that of Reverend Branscum.

In response to this testimony, Judge Kirby said:

I wouldn't say I didn't say it, but I certainly misrepresented it if I said it. I have nothing to do with burning him. It is up to the jury whether or not he gets that sentence. All I have to do is call the shots as I see them and give him [sic] a reasonably fair trial. It is not up to me to burn him or punish him. *If it was, we wouldn't have to have this trial.* [R. II, 86 (emphasis added).]

Judge Kirby overruled the request for recusal, as well as a serious motion for change of venue resting upon undue and prejudicial newspaper and broadcast publicity. [R. II, 30.]

Early in the trial Judge Kirby expressed his view of Walker's rights by stating to the potential jurors at the inception of voir dire:

By way of explanation, I might say to the jury that this is the second time this case has been tried, or will be the second time. Mr. Walker was tried once and

---

**3.** This account undermines the State's theory at the second trial that Vaughan, after being wounded in the heart, fired six shots at Walker. *See* page 1257 *infra.*

convicted and the Supreme Court reversed it and sent it back here for retrial, and this is the retrial, ladies and gentlemen. [R. II, 147–48.]

Judge Kirby overruled defense counsel's objections that the statement prejudiced Walker's second trial. [R. II, 149.]

Near the beginning of the prosecution's case, the prosecutor sought to read the first trial testimony of two very important witnesses, Linda Ford and Mary Roberts, rather than calling these witnesses in person. The prosecutor asserted that these witnesses were absent and could not be subpoenaed. Defense counsel stated that both women could be found nightly in Little Rock nightclubs. Defense counsel pleaded for a thirty-minute recess to obtain witnesses who could prove the women were in the Little Rock area. The court rejected this plea. The damaging testimony from Linda Ford was read into evidence without an opportunity for adequate new cross-examination. The prosecutor also read the prior testimony of Mary Roberts relating that she saw nothing of the shooting.

The devastating effect of Judge Kirby's ruling on this matter becomes even more apparent after examining the testimony that would have come before the jury had Judge Kirby required the State to produce its witnesses. At Walker's first habeas hearing, Mary Roberts testified that Vaughan fired the first shot and that she never saw Walker fire or even aim his gun. [H. I, 89.] She further stated that between the first and second trials she had informed the police that she intended to tell what really happened and change her testimony at Walker's second trial. [H. I, 75–76, 124–25.] She testified that North Little Rock police impliedly suggested she leave town before the second trial. [H. I, 82, 97–102.] Roberts also stated that on several occasions police officers had intimidated her regarding the Walker case. [H. I, 90.]

The majority's suggestion, *supra* at 1247 n. 18, that the defense might have subpoe-

naed Linda Ford and Mary Roberts ignores two vital considerations—(1) that it was the prosecution's obligation to present this testimony in a "live" form and (2) that the defense may not have known then that Roberts had been pressured to leave town by police and that she intended to give testimony which would tend to exonerate Walker. This information surfaced only at the subsequent habeas proceeding in federal court.

We relate these matters not to establish that the police or the prosecutors necessarily suppressed this evidence, but to emphasize the crucial nature of Judge Kirby's ruling denying Walker's counsel a recess to enable them to demonstrate that the witnesses were available in the Little Rock area. Had defense counsel been permitted to so demonstrate, the prosecutor would either have had to locate Linda Ford and Mary Roberts during the trial and place them on the stand, or forgo their testimony altogether.

Prior to the second trial, the defense sought and obtained court permission to submit the three revolvers seized at the scene of the shooting (the snub-nosed .38 caliber Smith & Wesson, the .38 caliber Colt found in the Oldsmobile, and the .38 caliber, four-inch-barrel Smith & Wesson allegedly found underneath Walker) to Stanton O. Berg, a noted firearms examiner from Minneapolis, Minnesota. Judge Kirby entered an order directing the defendant to "file with the Clerk of this Court as part of the record and proceedings herein the written ballistics report of said firearms examiner, and to furnish a copy to * * * [the] Prosecuting Attorney." [R. II, 24–25.] The prosecutor and defense counsel approved the order as to form. [R. II, 25.]

Berg's ballistics report cast doubt on a critical part of the State's case: the identification of the .38 caliber Smith & Wesson revolver found underneath Walker as the murder weapon.[4] Although the defense

---

4. The Berg report states in pertinent part:

 *8.* State whether or not you performed a ballistics test on [the weapon allegedly found underneath Walker], and if so what test did you perform.
 *A.* Yes—test bullets were fired and recovered and examined and compared microscopically.
 *9.* Was this weapon test fired and the specimens compared with the fatal bullet removed [from] the body of officer Vaughan?
 *A.* Yes.

 *10.* What was the condition of this fatal bullet when received by you?
 *A.* Very poor condition.
 *11.* Would the present condition of this bullet make positive identification of the bullet difficult?
 *A.* Yes it would. One side of this lead bullet is badly battered and scratched. The nose is badly scratched. One side of [the] bullet exhibits rifling marks. Two (2) land markings are visible and in fair condition. Three (3)

complied with the terms of the order, the jury never received this evidence. Judge Kirby, despite his pretrial order making the report part of the record, and the pretrial approval of both parties to the form of the order, prohibited the defense from reading the report into evidence. In reaction to Judge Kirby's ruling, Walker's attorney stated:

> At this time we want the record to show that the defendant relied in good faith on the Order made by the Court directing us to produce and deliver this ballistics report, that we complied fully with the Order of the Court and delivered a copy to Mr. Jernigan [the prosecuting attorney] and filed a copy with the Clerk, as the Court directed, to become a part of the record and proceedings; and this defendant is a pauper, that he doesn't have money to bring an expert and keep him down here for a week from Minneapolis, Minnesota. We had no way of knowing just when we would need [Berg], and the Court, just day before yesterday, refused to allow us 30 minutes delay to locate our witnesses. The only alternative we would have had would have been to spend thousands of dollars in keeping an expert here a week and bring him that distance when we, in good faith, relied upon the order that this court had made. [R. II, 848–49].

### D. *The Prosecutor's Evidence at Walker's Second Trial.*

Prior to Walker's second trial, his counsel sought and obtained ballistics evidence in the possession of the prosecution. Contrary to Judge Kirby's comment that the defense merely wanted "to make the prosecutor divulge his case" [R. II, 52], the ballistics evidence conclusively demonstrated that none of Barentine's shots wounded Walker. This disclosure destroyed the State's entire theory at the first trial, and forced the prosecution to present a different theory. The prosecution now theorized that Walker, firing first, shot Vaughan in the heart and that Vaughan, fatally wounded, fired his revolver six times, wounding Walker five times.[5]

To support its new theory, the State adduced essentially the same evidence as at the first trial. The prosecution read Linda Ford's testimony from the first trial that Walker started firing at Vaughan. Aided by Judge Kirby's exclusion of the defense's ballistics report, the prosecution introduced its own ballistics evidence in an attempt to establish that the Smith & Wesson .38 caliber revolver allegedly found underneath Walker fired the fatal bullet. To support its theory that Vaughan, fatally wounded, could have shot Walker, the prosecution called Dr. Leo Davenport, the State's examining pathologist, who testified that his statement in Vaughan's autopsy report that death was "almost immediate," meant that Vaughan died anywhere "from a minute to a few minutes" after he was wounded. [R. II, 759.]

### E. *Walker's First Habeas Corpus Proceeding—The Suppressed Alderman Testimony.*

At Walker's first habeas hearing, Aaron Paul Alderman appeared as a witness in support of Walker's petition. Alderman the second cabdriver to arrive on the scene, was an eyewitness to the shooting. Following the shooting, he gave North Little Rock police his statement. [H. I, 146.] A month or two after the shooting incident, Alderman moved to Lakeland, Florida. He stated that he had called the criminal court or the prosecuting attorney's office before the first trial to advise of his availability as a witness. [H. I, 169–70.] Alderman was

---

groove markings are visible of which two are damaged and the other is in fairly good condition. Because of the time elapse since it has been fired (almost 2½ years) areas of the bullet contains [sic] a light film of lead oxidation. All of these factors make positive identification difficult.

*12.* Were you able from your examination, notwithstanding the condition of the bullet to detect any disimilarities [sic] in the fatal bullet and those test fired from the [revolver]? If so please list and describe [any] disimilarities [sic] noted.

*A.* No disimilaritiès [sic] were noted in the class characteristics such as number of lands

and grooves and their widths, direction of twist etc. *A quite a few disimilarities [sic] were noted in the individual characteristics.* [Emphasis added.]

**5.** The majority suggests (*supra* at 1247 n. 21) that the defense at the first trial knew or should have known that Vaughan, not Barentine, shot Walker. That assertion derives no support from the record. The plain fact is that the State offered the theory that Barentine shot Walker and did not produce the ballistics evidence at the first trial. The defense learned of the existence of this evidence only when the prosecutor finally divulged it before the second trial.

never called as a witness and, in fact, never received notification of either of Walker's trials.

In our view, Alderman's testimony completely undermines the prosecution's theory that Walker shot Vaughan and that Vaughan, with a fatal bullet wound to his heart, wounded Walker five times. Moreover, the evidence establishes that either the prosecutor or the North Little Rock police suppressed Alderman's crucial testimony.

Alderman testified that on the night of the shooting incident, he drove Ford and Roberts to Walker and Kumpe's motel. When they arrived, Kumpe was standing outside. [H. I, 134.] Ford left the taxicab and went into one of the motel rooms. [H. I, 134.] Kumpe, brandishing what Alderman described as a ".38 Police Special" with a four- or five-inch barrel, told Alderman to leave. [H. I, 134.] At this point, Walker, Kumpe, and Ford apparently got into the white Oldsmobile and drove away. Roberts, who remained in Alderman's cab, asked Alderman to follow the Oldsmobile. Alderman, upon learning from Roberts that Kumpe and Walker had been involved in a barroom shooting incident earlier that evening, informed his dispatcher via his taxi radio. The dispatcher asked Alderman to follow the Oldsmobile and said he would relay the information to the police. [H. I, 135.]

Alderman followed the Oldsmobile, but soon realized that his cab could not keep pace and radioed for assistance. Thomas Short, another cabdriver, heard Alderman's call, and joined in pursuit. Short arrived at the scene of the shooting just behind the two police cars and Alderman arrived approximately two to three minutes behind the police. Shortly after Alderman arrived on the scene, Barentine shouted at him to shut off his headlights and move the car. [H. I, 151–52.] Alderman reached into the cab, turned off the lights, moved the cab slightly, and ran behind one of the parked police cars. Alderman stated that both police cars had their headlights on. [H. I, 154.] Alderman saw Vaughan approach the passenger's-side door of the Oldsmobile and say to Walker, "get out of the car with your hands up[.]" [H. I, 140.] Alderman saw the door open and heard Vaughan shout, "Hold it, he's got a gun." [H. I, 147.] Then the shooting began.

Alderman testified that he saw Vaughan fire at Walker. [H. I, 155.] Alderman stated that after four or five shots, Vaughan remained standing. [H. I, 142, 148.] In fact, Alderman stated that Vaughan remained on his feet after Walker had fallen out of the Oldsmobile. [H. I, 142, 148, 157.] The shooting subsided for a moment, and then Alderman heard one more shot that sounded like a shot in a barrel or pipe. [H. I, 141.] Vaughan took a few steps back after this shot, and fell forward on his face. Alderman testified that when the shooting began, he saw Kumpe go under the Oldsmobile. [H. I, 142.] After the shooting, Barentine told Kumpe to get out from under the car. Kumpe started to run, but Barentine fired twice and stopped him.

Alderman approached Walker and Vaughan, both lying beside the Oldsmobile. Alderman stated that it was he who first rolled Walker over. [H. I, 163.] He said that Walker held a snub-nosed pistol in his hand. Upon checking the chamber, Alderman discovered the gun was fully loaded. [H. I, 143, 165.] Alderman took the gun from Walker and stuck it in his belt. [H. I, 143.] Alderman went over to Vaughan, turned him over and checked his gun and discovered that all six shells had been fired. [H. I, 143–44, 165.] After picking up Vaughan's gun, Alderman gave both guns to a police officer.

As Alderman walked away from the two wounded men, he stated that he saw another gun near the rear end of the Oldsmobile. [H. I, 145.] He testified that this gun lay where Kumpe had been during the exchange of gunfire. [H. I, 145.] Alderman stated that he pointed the gun out to an officer rather than picking up the gun himself. He stated that it looked like the same gun that he had seen Kumpe brandish at the motel. [H. I, 148.]

### III. The Ends of Justice Require That We Reconsider The Trial Judge's Expressed Bias Against Walker.

First, Judge Kirby stated that he "intended to burn" Walker, and then he explained that if it were up to him he would not give Walker a trial.[6] Nevertheless, Judge Kirby ruled that he could give Walker a fair trial. [R. II, 30.] In 1969, this court held that Walker had received a fair trial. *Walker v. Bishop, supra,* 408 F.2d at 1382. The majority today denies Walker a retrial, regardless whether the trial was

6. For a complete quotation of Judge Kirby's statement, *see* page 1255 *supra.*

fair or not, for reasons of "finality." We would hold otherwise. That Walker could be tried and convicted before an admittedly prejudiced judge is a stain on our criminal justice system, which ought not go uncorrected.

Due process requires "[a] fair trial in a fair tribunal." *In Re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). Moreover, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). Can a trial before a judge who admits his deeply held bias against the defendant satisfy the appearance of justice? Can such a judge do justice? We think not.

In *United States v. Brown,* 539 F.2d 467 (5th Cir.1976), the Fifth Circuit considered the alleged prejudice of a trial judge who made pretrial statements similar to those made by Judge Kirby. In *Brown,* the trial judge said that he "was going to get that * * * nigger," referring to the defendant, H. Rap Brown. *Id.* at 468. When Brown sought post-conviction relief pursuant to 28 U.S.C. § 2255, the district court denied relief on the ground that the record demonstrated that Brown had, in fact, received a fair trial.

The Fifth Circuit reversed, observing that "the truth pronounced by Justinian more than a thousand years ago that, 'Impartiality is the life of justice,' is just as valid today as it was then." *Id.* at 469. The court concluded:

> The judge's statement did not comport with the appearance of justice, and it cannot be said from the record alone that appellant received a fair trial. Accordingly, the conviction and sentence must be vacated. [*Id.* at 470.]

Here, the record discloses a good deal more about the trial judge's bias than did the evidence in the *Brown* case. In addition to the testimony of members of the clergy regarding Judge Kirby's expressed prejudice, the record contains the judge's own statement that, in effect, he considered the forthcoming trial unnecessary. Judge Kirby's statements do not comport with the appearance of justice.

Judge Kirby's prejudice continued to manifest itself throughout Walker's second trial. Having presided over Walker's first trial, Judge Kirby knew the weaknesses of the prosecution's case. He knew that the prosecution's case rested in large part on Linda Ford's conclusory statement at the first trial that Walker "started firing," and on the prosecution's ballistics evidence that the gun allegedly found underneath Walker fired the fatal bullet. Judge Kirby's rulings on these critical evidentiary matters allowed the prosecution to present the testimony of Linda Ford and Mary Roberts free from cross-examination on the State's new theory, and to present its own ballistics evidence unrebutted by Walker's ballistics expert's report.

We do not believe an unprejudiced judge would have denied Walker's counsel a thirty-minute recess to establish that Ford and Roberts were available as witnesses. We believe an unprejudiced judge would have abided by his prior ruling that the defense ballistics report, following its disclosure to the prosecutor and judge, would remain part of the "record and proceedings," and that an unprejudiced judge would have permitted the jury to consider the report. After all, counsel for Walker and the State approved as to form Judge Kirby's pretrial ruling which ordered the Berg report made part of the record. We believe an unprejudiced judge would, and properly could, have ruled that the State's approval of the order making that report part of the record amounted to a stipulation to its admissibility.

There can be no justification for Judge Kirby's changing his ruling. He knew that Walker lacked sufficient financial resources otherwise to avail himself of the information contained in the Berg report, which cast doubt on the validity of the State's crucial ballistics evidence. *Whether the Berg report constituted hearsay is irrelevant in the context of this case. The focus of our inquiry is not on the correctness of Judge Kirby's evidentiary rulings, but rather on his bias and prejudice as reflected in his rulings.*

Judge Kirby's defense that it was not up to him "to burn or punish [Walker]," is no defense at all. First, as a general rule, no one can dispute that a biased judge can influence a jury in countless ways. Moreover, and more important to the case at bar, Judge Kirby's rulings had an undeniably overwhelming impact on the jury's verdict.

The prior opinions denying Walker's habeas petition do not address Judge Kirby's prejudice in this context. In its opinion dismissing Walker's first application for habeas relief, the district court devoted five

paragraphs to the prejudice issue. The court stated that, even assuming that Judge Kirby believed prior to the second trial that Walker was guilty and that he should be sentenced to death, "blatant, subjective prejudice of that sort is not enough to require a judge to disqualify himself in a jury case." *Walker v. Bishop, supra,* 295 F.Supp. at 773. · The court did not discuss any of the trial judge's rulings and their effect on the fact-finding process. Moreover, the court did not specifically refer to Judge Kirby's "burn the S.O.B." comment. The district court did remark that it would have been better had Judge Kirby not made some of his comments to the jury, but the court concluded that these comments did not amount to a denial of due process.

On appeal, this court's 1969 panel discussed the trial judge's prejudice more extensively, but, like the district court, did not discuss the specific effects of any of Judge Kirby's rulings. In reference to Judge Kirby's "burn the S.O.B." comment, the panel remarked, "[t]he alleged statement * * * if made, could at the very most be construed to indicate the judge's feelings that the defendant was guilty and any such innermost thoughts on the part of the judge constituted no cause for his disqualification." *Walker v. Bishop, supra,* 408 F.2d at 1382. The panel said that, on a canvass of the entire record, it appeared that "at the very worst the court might have shown some irritation at defense counsel's trial tactics[.]" *Id.* The panel also adopted language from the Arkansas Supreme Court's opinion upholding the conviction, to the effect that "the trial court conducted the trial in an exemplary manner and without any bias or prejudice toward the accused." *Id., quoting Walker v. State, supra,* 408 S.W.2d at 912.

Neither of the two prior opinions which addressed the prejudice issue inquired whether Judge Kirby's prejudice affected the jury's fact-finding. We now conclude that Judge Kirby's prejudice did infect the fact-finding process. Judge Kirby refused to grant a thirty-minute recess to the defense so that they might show that Ford and Roberts were present in Little Rock, and he refused to allow the Berg report into evidence, although he had previously ruled that the report would be made part of the record. These crucial rulings, in light of Judge Kirby's pretrial admission of prejudice against Walker, conclusively demonstrate that his prejudice distorted the fact-finding function of the jury.

In short, Judge Kirby admitted he was prejudiced, and his actions supported his words. Judge Kirby's prejudice permeated Walker's entire second trial, thus depriving him of his constitutional right to a fair trial.

## IV. The Ends of Justice Require Habeas Relief for the State's Suppression of Alderman's Testimony.

Aaron Paul Alderman, the second cabdriver to arrive on the scene, possessed vital eyewitness information about the shooting. According to Alderman, Walker lay wounded by the side of the Oldsmobile while Officer Vaughan remained standing. Alderman testified that he was the first person to reach Walker after the shooting and that Walker held only one gun—the unfired, fully loaded, snub-nosed pistol. Alderman's testimony undoubtedly constituted the strongest evidence for the defense.

At Walker's first habeas hearing, Alderman testified that following the shooting he gave a statement to the police. Several police officers corroborated this part of Alderman's account. Both Captain Knight and Lieutenant Gilbert testified at the habeas hearing that they saw Alderman after the shooting at the prosecutor's office when statements were being taken. [H. I, 198, 199, 285.] Although neither man could confirm that Alderman actually gave a statement, their uncontroverted testimony placed Alderman with the other witnesses from whom statements were taken. From the record, it must be deemed established that someone took Alderman's statement. *See Walker v. Bishop, supra,* 295 F.Supp. at 779.

Alderman testified that he contacted the prosecution a few months after the shooting to report his new Florida address. He was told that if he were needed he would be contacted. [H. I, 170.] The prosecution never contacted Alderman; the prosecution never called Alderman to testify; the prosecution never even informed defense counsel of Alderman's existence or whereabouts.

At Walker's first habeas proceeding, the State announced that the files containing the statements of Alderman, Ford, and Roberts had, unaccountably, been "lost." From these circumstances, a clear and obvious conclusion follows: The police and the

prosecution recognized Alderman's importance and attempted to suppress his testimony.[7] But at this, at least, they were unsuccessful. Fulfilling the poet William Cullen Bryant's prophecy that "truth, crushed to earth, shall rise again," Alderman's testimony finally surfaced at Walker's first habeas hearing.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Supreme Court held that a prosecutor has the duty to disclose exculpatory evidence to the defendant, even absent a request by the defendant, when the evidence "is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed[.]" *Id.* at 110, 96 S.Ct. at 2400. The Supreme Court went on to set forth the standard for evaluating the omitted evidence:

It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. [*Id.* at 112–13, 96 S.Ct. at 2401–02 (footnote omitted).]

Alderman's testimony at Walker's first habeas proceeding indicated that Alderman had served in the military police while in the service during the Korean War. Alderman, a disinterested observer in good position to view all of the events, testified at length and in detail. Both police cars had their lights on and Alderman testified that he could see all of the participants in the shooting well except for Kumpe during the time when Kumpe was under the Oldsmobile. [H. I, 141–42, 154, 159.]

We recognize that at Walker's first habeas proceeding the district court largely discredited Alderman's testimony. *See Walker v. Bishop, supra,* 295 F.Supp. at 779. It is not this court's function to evaluate the credibility of witnesses. By the same token, the function of the district court at Walker's first habeas proceeding was not to judge Alderman's believability under ordinary credibility standards. Under *Agurs,* the proper test is whether a jury might have credited Alderman's testimony to such an extent as to create a reasonable doubt in the minds of the jurors. To this end, we note the following testimony that corroborated Alderman's account:

1) At both trials, Thomas Short, the other cabdriver, confirmed Alderman's account of his radio conversations with the dispatcher. [R. I, 77.] [R. II, 542.]

2) Alderman's description of the fatal shot comports with that of Short. Alderman said that he heard a shot, and that Vaughan took two or three steps backward and fell on his face. [H. I, 142.] Short said that Vaughan "was dancing this jig, * * * I heard a shot, and then I seen him jump off this bank there, and he [Vaughan] just fell flat on his chest." [R. I, 84.]

3) Alderman's testimony that the gun found in Walker's hand, the Smith & Wesson snub-nose, was fully loaded accords with all other testimony.

4) Alderman testified about police hostility toward Walker following the shooting—one officer "stomped" on Walker [H. I, 145]; another officer cursed at Walker and threatened to kill him. [H. I, 144.] The gist of Alderman's testimony was confirmed by Lieutenant Marvin Gilbert, a North Little Rock police officer, who testified that he had to disarm some officers to protect Walker and that police officers displayed great resentment toward Walker. [H. I, 287–288.]

5) Some important corroboration of Alderman's account exists in Officer Barentine's initial report to the police department. In that report, made six or seven hours after the incident, Barentine said Vaughan shot Walker five times. The report makes no mention of Walker ever firing at Barentine. [H. I, 179, 380–81.]

Thus, in our view, no basis exists for a ruling that this important but suppressed testimony so lacks credit that it would make no difference to a jury. Indeed, from the record we think it clear that members of a jury could, and probably would, have credited Alderman's testimony at least to an extent sufficient to create a reasonable doubt of Walker's guilt. The police and the prosecution suppressed Alderman's account of the shooting. Their actions consti-

---

7. In so asserting, we are also mindful of the conduct of the police and the prosecution in withholding ballistics evidence at Walker's first trial and in advancing the theory that Barentine, not Vaughan, shot Walker after Walker shot Vaughan.

tute an egregious denial of Walker's constitutional rights.

### V. The Evidence From the Entire Record Does Not Show Walker to Be Guilty Beyond a Reasonable Doubt.

As we have noted, our discretionary consideration of Walker's successive application for habeas relief is premised on serving the ends of justice. Absent a substantial disruption of the jury's fact-finding process, constitutional violations by themselves might not warrant relief at this late date. In this case, however, we are not confronted with so-called "technicalities"; we are not setting aside the conviction of an obviously guilty man on the basis of a "loophole." Here, the violations of Walker's constitutional rights completely warped and distorted the jury's fact-finding process. The jury's verdict is tainted, and, in the interest of justice, cannot stand.

The evidence of Walker's guilt is extremely weak, consisting almost entirely of tainted testimony admitted into evidence by a prejudiced judge. Moreover, Walker's conviction is based upon the almost incredible theory that Vaughan, having suffered a fatal wound to his heart, fired five bullets into Walker. After considering the entire record, including the ballistics evidence that Judge Kirby kept from the jury and the suppressed testimony of Alderman, we strongly believe that no rational, informed, and impartial trier of fact could find Walker guilty beyond a reasonable doubt.

The majority, *supra* at 1246, relying on *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), concludes that the evidence, seen in the light most favorable to the prosecution, establishes guilt beyond a reasonable doubt.

At the same time, the majority, *supra* at 1245, asserts that Walker's argument "is essentially based on * * * conclusions drawn most favorable to Walker," and that this dissent accepts such conclusions. We must reject that characterization of our review of the record, inasmuch as we document each item of crucial evidence with precise references to the record.

We hold a different view from the majority on what is to be reviewed under the "ends of justice" standard as set forth in *Sanders*. The majority examines only the second trial record, and uncritically accepts the State's contentions. The dissent examines as objectively as possible the record as a whole; that is, the records of both trials and both habeas proceedings.

In the typical case, the inquiry on appeal is whether, considering in the light most favorable to the prosecution all the evidence *the jury heard*, a reasonable finder of fact could have found the defendant guilty beyond a reasonable doubt. But this case is different. The actions of the police, the prosecution, and the trial judge improperly kept the jury from hearing the evidence in Walker's favor. Therefore, the inquiry here must comprehend *all* the evidence—not only what the jury heard, but also what—to Walker's great prejudice—the jury was kept from hearing. We believe that, looking at all the evidence from both trials and both habeas hearings, no reasonable trier of fact could have found Walker guilty beyond a reasonable doubt.

With respect to the crucial testimony of Linda Ford, we are in as good a position as was the jury at the second trial to evaluate credibility. For that jury did not hear Linda Ford testify; it heard only a reading from the transcript of her testimony at the first trial. Ford's testimony, as recorded in that transcript, fails in several critical respects to support the theory which the State advanced at the second trial. Ford testified that Walker had his pistol (singular, not two pistols) out; that Walker started firing (a conclusion admittedly not based on direct observation, see *supra*, at 1254); and that she did not know how many times Walker fired *the* gun. This report came, moreover, from a seventeen-year old girl who admitted having had at least five drinks during the night in question. [R. II, 608–09, 611–12.]

That is in essence the testimony upon which the State relied to convict Walker and upon which the State must now rely in arguing that the "ends of justice" will not justify reaching the merits of this subsequent application for habeas relief.

The Supreme Court noted, in setting forth the "ends of justice" as the test by which to evaluate successive habeas corpus petitions, that that test "cannot be too finely particularized." *Sanders v. United States*, *supra*, 373 U.S. at 17, 83 S.Ct. at 1078. In this case, the defendant faced trial before a prejudiced judge who in ways enumerated in this and prior opinions may have weighted his evidentiary rulings to obtain a conviction. The police suppressed the important Alderman testimony. At the first trial, the prosecution suppressed bal-

listics evidence and prosecuted Walker on the theory that Walker shot Vaughan and that Barentine shot Walker. In support of this theory, the prosecution produced testimony that Vaughan's death was almost immediate. At the second trial, after the ballistics evidence became known to Walker's counsel, the prosecution devised another theory—that Walker shot Vaughan not with the gun found in his hand, but with another gun which was found lying at the scene, and that Vaughan, with a bullet in his heart, then fired five bullets into Walker. To support this theory, the prosecution presented the altered hypothesis of the pathologist witness that Vaughan "could have" fired repeatedly after having been shot in the heart. [R. II, 760.]

Given all these circumstances, we believe that the "ends of justice" require a review of the whole record to determine whether the evidence indeed supports Walker's conviction.

Testimony at both trials by prosecution witness Thomas Short indicates that Vaughan did no shooting after being shot. We have cited his testimony from the first trial, *supra* at 1255. In the second trial he repeated his testimony in these words:

Q You say you saw the police officer [Vaughan] kind of jump and try to back up a little bit [after the opening of the right door of the Oldsmobile].

A Yes, Sir.

Q And then you heard a shot?

A Yes, Sir.

Q What happened to the officer?

A Well he raised himself off the ground and he—and then his feet flew from under him and he fell on his face. [R. II, 518–19.]

This evidence and common sense suggest that the pathologist's opinion that Vaughan could have fired the shots into Walker amounts to speculation without support in the record.

Alderman's postconviction testimony, to which reference has already been made, clearly establishes that Walker did not shoot Vaughan. We reproduce that testimony in part:

Q Alright: after the shots momentarily ceased what did you see happen to Walker's body?

A He slumped over forward and then to the right on the ground and stretched out—

Q Alright,—

A in a prone position, I would say.

Q At this time was Vaughan on his feet?

A Yes, sir, he definitely was.

Q Alright, now, you described a shot that went "boom"?

A Yes, sir.

Q Did that occur after Walker had fallen from the car?

A Yes, sir, Walker was laying face down on the ground.

Q After this shot that went "boom" did Vaughan immediately fall?

A He taken two steps backward or three and fell forward on his face. [H. I, 142.]

Mary Roberts testified at the first habeas hearing that Vaughan, not Walker, fired the first shot, thus undermining the State's theory that Walker shot Vaughan and *then* Vaughan shot Walker:

Q Do you know who fired the first shot there at the scene?

A Yes, sir.

Q Who fired it?

A The officer that opened the passenger side of the car.

Q Do you know how many times this officer fired this gun?

A No, sir.

Q Before he was killed?

A No, sir. [H. I, 89.]

That evidence is part of the whole record. We have examined the whole record to determine whether the ends of justice permit reconsideration of the merits of Walker's second petition. That whole record serves to nullify completely the State's extremely tenuous theory that Vaughan, with a bullet in his heart, shot Walker five times. For if Vaughan first shot Walker five times and seriously wounded him, as the record shows, no reasonable basis exists for a factual determination that Walker thereafter shot Vaughan, particularly when, as testified by Alderman, Walker lay on the ground outside the car when Vaughan received the fatal single bullet to his body.

## VI. *Conclusion.*

After painstakingly reviewing the record, we stand convinced that this court erred

fifteen years ago in affirming the district court's denial of Walker's petition for habeas relief. We believe that Walker's conviction constitutes a miscarriage of justice: Judge Kirby's prejudice deprived Walker of a fair trial, and the State withheld crucial evidence. The record, including the evidence that the police and the prosecution wrongfully suppressed and the evidence unfairly excluded from the jury's consideration by reason of Judge Kirby's prejudice, demonstrates that no rational, informed, and impartial trier of fact could have found Walker guilty.

Moreover, the taint of Walker's two unfair trials, which we think a careful analysis of the full record demonstrates, cannot be ignored or concealed by reference to this court's or the district court's prior opinions, for it is apparent that the prior panel of this court erred in its analysis of the record.

At least in part, the majority's decision to deny Walker relief rests on the perceived importance of finality, notwithstanding that on the same record, relief might or should have been granted when the case first came before this court in 1969. While we share the majority's belief that repetitive habeas petitions should ordinarily be denied, that rule cannot and should not be absolute. For in the exceptional case where a grievous miscarriage of justice has occurred, that rule if inflexibly applied means that because justice has been delayed, justice must be denied. Such an application, we cannot here abide.

It is not too late to right the wrong committed against Walker. The "Great Writ" is "both the symbol and guardian of individual liberty." *Peyton v. Rowe*, 391

U.S. 54, 58, 88 S.Ct. 1549, 1551, 20 L.Ed.2d 426 (1968). It is "a bulwark against convictions that violate 'fundamental fairness.'" *Engle v. Isaac*, 456 U.S. 107, 126, 102 S.Ct. 1558, 1570, 71 L.Ed.2d 783 (1982) *quoting Wainwright v. Sykes*, 433 U.S. 72, 97, 97 S.Ct. 2497, 2511, 53 L.Ed.2d 594 (1977) (Stevens, J., concurring). We recognize that the passage of years will, undoubtedly, make it difficult, if not impossible, to retry Walker. Recently, however, Chief Justice Burger reiterated that the lapse of many years should not defeat the possibility of habeas relief if "the petitioner can demonstrate a miscarriage of justice or a colorable claim of innocence." *Spalding v. Aiken*, —— U.S. ——, 103 S.Ct. 1795, 1795, 76 L.Ed.2d 361 (1983) (denial of certiorari) (Statement of Burger, C.J.).[8]

In this case, the constitutional protections guaranteed to every one of us were subverted at Walker's second state-court trial. It matters not whether James Dean Walker is a "good" or "bad" person; the test of our judicial system is its capacity to do justice to all persons, regardless of their station in life.

Accordingly, we would reverse and remand with directions to the district court to issue the writ if, within thirty days following the issuance of our mandate, the State of Arkansas had not announced its intention to retry Walker within a reasonably expeditious time thereafter.

### ADDENDUM

The parties are entitled to a word of explanation relating to the second en banc hearing on this habeas case. On September 15, 1983 at a general meeting of the court, there was discussion of the possibili-

---

**8.** The majority suggests that we have misapplied the sufficiency of the evidence standard of *Jackson v. Virginia, supra*, 443 U.S. at 319, 99 S.Ct. at 2789, by failing to examine the evidence in the light most favorable to the prosecution. In fact, we have neither reached nor decided the issue of the sufficiency of the evidence at Walker's second trial to support his conviction. We have merely noted the weakness of the prosecution's case, which relied principally on tainted testimony admitted into evidence by a prejudiced judge, and observed that the jury did not get to hear the important Alderman testimony.

Had Judge Kirby's admitted prejudice not affected what evidence the jury heard, and had the police and prosecution not effectively prevented the jury from listening to Alderman's version of the incident (which version the testi-

mony of other witnesses confirms in many details), this court would not grant habeas relief to Walker. But that is not the situation. Walker has established violations of his constitutional right to a fair trial, and the whole record of all the proceedings in this case, including the two trials and the various post-conviction proceedings, demonstrates "a miscarriage of justice [and] a colorable claim of innocence." *Spalding v. Aiken, supra,* 103 S.Ct. at 1795. We have not found it necessary or proper to reach or determine the sufficiency of the evidence to convict at the second trial, under the standards enunciated in *Jackson v. Virginia, supra,* when the whole record before us demonstrates that "the ends of justice," *Sanders v. United States, supra,* 373 U.S. at 15, 83 S.Ct. at 1077, require habeas relief in this case.

ty that a rehearing en banc might be requested, and with two new judges, conceivably a contrary result be reached, after the opinion and dissent as they were then prepared were filed on behalf of the seven members who heard the case. After this discussion, the court by a 6 to 3 vote amended its rules relating to en banc procedures to provide:

> that [a] judge who is appointed prior to the time that an opinion is released by the court * * * *may* make a request to participate, and if so, then the submission should be vacated and the case resubmitted either on the briefs or oral argument.

Following that rule change and an election to participate in the case by newly appointed judges (who had not suggested or initially sought the rule change), the clerk of court entered the following order on September 29, 1983:

> On the Court's own motion, the en banc submission of September 15, 1982, on the habeas corpus issue of this appeal is hereby vacated and the case is reset for argument to the Court en banc on Tuesday, November 29, 1983, in St. Louis, Missouri.

The case was then reargued en banc.

Before LAY, Chief Judge; HEANEY, BRIGHT, ROSS MCMILLIAN, ARNOLD JOHN R. GIBSON, FAGG, BOWMAN, Circuit Judges, *En Banc.*

## ORDER

·The petition for recall of mandate, filed March 15, 1984, is hereby granted.

The case is remanded to the district court with instructions to take evidence from Russell Kumpe and his former wife, Peggy Davidson, relating to Kumpe's alleged firing of a gun at or near the time that Officer Vaughan was shot on the night of April 15–16, 1963. That evidence is to include the diary entry apparently dated January 16, 1968, relating to that incident.

On remand, the State may offer as evidence the recorded confession of Walker allegedly made after his first trial. Walker may offer evidence to explain that alleged confession.

The remand proceedings may be limited to the receipt of the evidence mentioned by both sides in their papers with respect to the recall of mandate, including the Kumpe statements and the recorded confession of petitioner and any explanation thereof and such additional evidence as the district court in its discretion may deem relevant to these proceedings.

The district court should determine whether any of this evidence is credible enough to deserve the attention of a jury; whether the evidence would be admissible if a new jury trial were held; and whether the new evidence, when considered against the background of the existing record, sufficiently tips the balance of the "ends of justice" standard to require that·a new trial be held. These findings should then be certified to this Court, sitting en banc, which can then consider, after briefing and oral argument, whether the new evidence, in the light of the district court's findings, requires a new trial.

The district court is directed to expedite its hearing and the making of appropriate findings.

ARNOLD, Circuit Judge, concurring.

I continue to believe that this Court correctly affirmed the District Court's denial of this successive petition for habeas corpus. My reasons have been stated and need not be repeated here. *Walker v. Lockhart,* 726 F.2d 1238, 1250–52 (8th Cir.) (en banc) (concurring opinion), *petition for cert. filed,* 52 U.S.L. Week 3862 (U.S. April 1984) (No. 83–1835). The motion for recall of mandate, however, presents a new situation requiring, in my judgment, a somewhat different result.

The predicate of my concurring opinion was that there had been no change in the law, and that no new evidence had appeared, since this Court's affirmance of the denial of the first habeas petition. The motion for recall of mandate demonstrates that this predicate may no longer be valid. In particular, the motion details certain new evidence that petitioner wishes to offer. This evidence has never been heard by any court, state or federal. The most significant item of new evidence is a diary purportedly written by Russell Kumpe, the driver of the automobile in which Walker was riding on April 16, 1963, the night Officer Vaughan was killed. The diary entry for January 16, 1968, we are told, reads in pertinent part as follows:

> Awakened at 1:30 a.m. by nite sheriff, told only to go to Mr. O's Office—emergency. A great deal of agitating being

done by James Dean Walker. I look at him and feel much remorse that I fired too high 4-16-63. He, according to rumor has vowed he will kill me at first opportunity. I do not underestimate his potential, but am not alarmed.

In addition, counsel offered to prove by Kumpe's former wife that Kumpe twice admitted to her that he, not Walker, had shot the officer.

There was evidence previously available that Kumpe was armed on the night in question, and an inference could have been drawn from the testimony of Aaron Paul Alderman at the first habeas hearing that Kumpe fired the fatal shot from under the car in which he and Walker had been riding. The evidence cited above, however, is the first solid indication that Kumpe in fact fired his gun on the night in question, and, if believed by the trier of fact, it would greatly increase the chance that Alderman's account, which exonerates Walker, would also be believed.

The State's principal response is that Kumpe's diary and his alleged statement to his former wife are both hearsay and could not be admitted in evidence at any new trial. Accordingly, it is argued, their existence cannot affect the question whether such a new trial should be held. I am inclined to believe that the State's point is well taken, in the sense that the diary and the alleged statement probably would not be admissible as substantive evidence. Certainly they are hearsay and would come in only if they could be fit within the exception for declarations against interest. Uniform R. Evid. 804(b)(3), adopted by Ark. Stat. Ann. § 28-1001 (Repl. 1979), creates a hearsay exception for declarations against interest when the declarant is unavailable. Kumpe is not unavailable. He could be called as a witness (though he never had been before). Possibly he would invoke his privilege against self-incrimination and refuse to testify, in which event he would be treated as an unavailable witness, see Unif. R. Evid. 804(a)(1), but even so Rule 804(b)(3) would probably still keep the hearsay out, because under this rule a "statement tending to expose a declarant (here Kumpe) to criminal liability and offered to exculpate the accused is not admissible unless corroborrating circumstances clearly indicate the trustworthiness of the statement."

Even if we assume that the hearsay could not come in as substantive evidence, however, it would probably still get before the jury in some form for purposes of impeachment. Kumpe could be called as a witness and asked wheter or not he shot Vaughan. If his answer is no, he could then be asked whether he had made the alleged statements to his former wife, and whether he had made the claimed diary entry. If he admits the diary entry and the statements to his former wife, the fact of these prior inconsistent statements would then be before the jury, together with whatever explanation Kumpe might wish to offer. If, on the other hand, he denies making the alleged prior inconsistent statements, extrinsic evidence of these statements, including the diary itself and the testimony of Kumpe's former wife, could be offered for impeachment purposes. See Jones, Case Note, Roberts v. State: *A Limitation on the Impeachment of Witnesses by Extrinsic Evidence of Prior Inconsistent Statements,* 37 Ark. L. Rev. 688 (1984). In either event, the jury would know about the diary entry and the alleged oral admissions. It would have an aopportunity to observe Kumpe in person and to assess his credibility in ilght of all the circumstances, including the prior inconsistent statements. Ordinarily, newly discovered evidence is not sufficient to justify new proceedings if it goes only to the credibility of a witness, but this case is so evenly balanced that this sort of impeachment of Kumpe's credibility could well be decisive in the mind of the jury. (It is worth recalling at this point that Alderman, like Kumpe, has never been heard by a jury.)

The State also responds that Walker himself has confessed to the crime, and that to give a new trial to someone who admits he is guilty cannot serve "the ends of justice." The text of this confession, first brought to this Court's attention by Walker's own motion for recall of mandate, is attached to the State's response to the motion, and its authenticity foes not seem to be denied. The statement, which was tape-recorded, was given while Walker was in jail after having been convicted and sentenced to death at his first trial. The statement was apparently intended to be played to church congregations to show Walker's conversion and repentance. The statgement says, among other things:

I had committed I can say, ah, every sin imaginable * * * stealing up to adulter, fornication * * * murder, even.

Yes, I know it's hard on you to take a life * * * Her [Mrs. Vaughan's] husband's dead and that in some way, I don't know how, I would like to tell her that * * * I know "I'm sorry" doesn't say very much, but * * * that's how * * * it's a terrible thing to have happen.

As Walker's reply to the State's reponse points out, this statement was available to the State at the time of the second trial and was not offered in evidence. Perhaps the State thought it did not need the evidence. Perhaps it thought the playing of the tape would offend someone's religious sensibilities. For my part, the statement appears to be strong evidence indeed against Walker's protestations of innocense. His reply does not deny that he made the statement and does not contest the accuracy of the text appended to the State's response. But there could be some explanation that a trier of fact might accept. This again is an issue appropriately to be decided, in the first instance, by a trial court, not by us. It should be observed, in additon, that the taped statement is not newly discovered evidence in the same sense as the Kumpe statements are. The taped confession is new to us, having never been offered into evidence before in any court, but it is not new to the parties.

My conclusion, on balance, is that the new material presented to this Court in the motion for recall of mandate sufficiently adds to the uncertainites of this case to justify additional proceedings. In my view, these proceedings should take the following shape. This case should be remanded to the DistrictCourt with directions to hold a new evidentiary hearing. This hearing would include the receipt of the new evidence mentioned by both sides in their papers with respect to the recall of mandate, including the Kumpe statements and the recorded confession of petitioner. The District Court should determine whether any of this evidence is credibile enough to deserve the attention of a jury; whether the evidence would be admissible if a new jury trial were held; and whether the new evidence, when considered against the background of the existing record, sufficiently tips the balance of the "ends of justice" standard to require that a new trial be held. These findings should then be certified to this Court, sitting en banc, which can then consider, after briefing and oral argument, whether the new evidence, in the light of the District Court's findings, requires a new trial.

On remand, the question may arise whether the newly discovered evidence should first be presented to the state courts before being considered by the federal habeas court. I think the answer to this question is no. We have heard no new federal ground asserted for setting aside the judgment of conviction. The same grounds continue to be asserted, primarily the prejudice of the trial judge. The new evidence, rather than constituting a new ground for attack on the conviction, goes to the question whether the factual basis for the conviction is so unsure that a successive habeas petition should be granted. This issue is for the federal habeas court to decide. (The State, in any case, has not argued that failure to exhaust state remedies is a problem here, so the point has appreantly been waived. See *Pickens v. Lockart*, 714 F.2d 1455, 1458 n.2 (8th Cir. 1983).

Certainly recall of mandate is an extraordinary remedy. There seems to be nothing ordinary about this case. Under 8th Cir. Rule 18, a mandate may be recalled "to prevent injustice." I think that is the situation presented here. To be sure, a denial of the motion for recall of mandatt would not forever bar consideration of the new evidence now prooffered. Walker could still file a third habeas petition and start anew in the District Court. Thisalternative would probably involve more cost and more time in a case that has already consumed too much of both. The third habeas petition might even be assigned to a different district judge, which would be a waste of the considerable time and effort already invested in the case by Judge Woods. Probably this case will never be settled to everyone's satisfaction, but the State as well as the petitioner will be well served by attemptiong to settle it finally as soon as possible.

For these reasons, I vote to grant the motion for recall of mandage and to remand the cause for further proceedings outlined in the order of the Court.

McMILLIAN Circuit Judge, joins this concurring opinion with the exception of the first paragraph and the first two sentences of the second paragraph.

JOHN R. GIBSON, Circuit Judge, dissenting, joined by ROSS, FAGG, and BOWMAN, Circuit Judges.

I would deny the motion for recall of mandate. The motion raises new factual issues and these should be brought before the district court in a new petition for habeas corpus under 28 U.S.C. § 2254. In my view, the recall of mandate simply confuses the clearly new matters upon which evidence must be heard and what has been considered before.

The Court's order today charges the district court with determining whether the Kumpe evidence should be submitted to the jury. I have some doubt that the order is consistent with *Townsend v. Sain*, 372 U.S. 293, 317, 83 S.Ct. 745, 759, 9 L.Ed.2d 770 (1963), and *Drake v. Wyrick*, 640 F.2d 912, 914 (8th Cir. 1981). Newly discovered evidence must bear upon the constitutionality of the detention. Such evidence relevant to the guilt to the state prisoner is not a ground for relief on federal habeas corpus. Further, when newly discovered evidence is considered, issues of whether the evidence was available at the time of trial, both the original criminal trials and habeas corpus hearings, and whether the evidence could have been discovered by due diligence ar appropriate issues for inquiry.